IN THE MATTER OF JANET ROWE DUGAN.

Suffolk. October 4, 1993. - December 2, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Clerk of Court. Supreme Judicial Court*, Removal of clerk of court. *Practice, Civil*, Proceeding for removal of clerk of court.

The public good required removal from office of the clerk-magistrate of a District Court under G. L. c. 211, § 4, where the uncontested facts established that, in a large number of incidents occurring in the course of her duties, she had committed abuses of her authority involving favoritism, lack of impartiality, improper treatment of court personnel and others, failure to follow lawful directions, refusal to permit certain matters to be heard, denial to news reporters of access to public records, and use of court personnel to perform personal services for her. [463-470]

FORMAL CHARGES filed in the Supreme Judicial Court on February 22, 1993.

Interlocutory matters were heard by *Greaney*, J., to whom the proceeding was referred by the full court.

*Francis D. Dibble, Jr.* (*Carol E. Kamm* with him) for Committee on Professional Responsibility for Clerks of the Courts.

*James G. Reardon* (*Julie E. Reardon* with him) for the respondent.

WILKINS, J. In February, 1993, this court's Committee on Professional Responsibility for Clerks of the Courts, created pursuant to S.J.C. Rule 3:13, as appearing in 407 Mass. 1309 (1990) (committee), filed formal charges against Janet Rowe Dugan, clerk-magistrate of the Northampton Division of the District Court Department of the Trial Court (clerk). Based on ten charges, the committee generally alleged that the clerk had engaged in wilful misconduct in office, conduct

prejudicial to the administration of justice, conduct un-
becoming a clerk-magistrate that brings the office of clerk-
magistrate into disrepute, and conduct that violated provi-
sions of S.J.C. Rule 3:12, as appearing in 407 Mass. 1301
(1990), the Code of Professional Responsibility for Clerks of
the Courts.[1]

On March 2, 1993, this court, after hearing the parties,
ordered the clerk suspended from all powers and duties as
clerk-magistrate until further order of the court. On March
11, 1993, a single justice of this court, to whom the matter
had been referred for handling, appointed James P. Lynch,
Jr., a retired justice of the Superior Court Department of the
Commonwealth, as a hearing officer to conduct a hearing
and to determine any contested issues of fact. A hearing was
held in May, 1993, and on June 28, 1993, the hearing officer
submitted his report to the committee, including detailed
proposed findings of fact and his recommendation that the

---

[1]The clerk challenges the jurisdiction of the committee to deal with al-
leged misconduct which occurred prior to its creation in 1990. She also
challenges the application of the Code of Professional Responsibility for
Clerks of the Courts, which became effective on April 1, 1990, to alleged
misconduct occurring before that date. The applicable principles expressed
in the code are general principles that exist and have existed quite apart
from the code. This court's rule 3:13, moreover, granted the committee
authority to investigate not only violations of the code but also, among
other things, wilful misconduct in office, conduct prejudicial to the admin-
istration of justice, and conduct unbecoming a clerk-magistrate. S.J.C.
Rule 3:13, as appearing in 407 Mass. 1309 (1990). Rule 3:13 states no
limit as to the time when matters of this character may have occurred. All
the charges on which the committee based its conclusions fit within one or
more of the categories of the rule, apart from the code. Moreover, rule
3:13 states that the rule does not abrogate the authority of this court in
any area within the committee's jurisdiction. If we were to disregard the
committee's findings and recommendations, the matter would still properly
be before us on the proposed findings and recommendations of a hearing
officer appointed by a single justice of this court on authority delegated by
the full court.

Justice Greaney, as single justice, denied the clerk's motion to dismiss
all charges based on acts that predated the creation of the committee or,
alternatively, to bar the introduction of evidence of such acts. Justice
Greaney has not participated in the court's deliberations and decision on
the clerk's appellate challenge to the denial of that motion. From what we
have said, it is apparent that the denial of the clerk's motion was proper.

clerk be removed from office. On July 29, 1993, the clerk waived argument before the committee on the discipline that should be imposed. She filed no objection to the proposed findings of fact.

The committee adopted the hearing officer's proposed findings of fact and, on August 25, 1993, recommended in a report to this court "that Janet Rowe Dugan be permanently removed from her position as Clerk-Magistrate" pursuant to G. L. c. 211, § 4 (1992 ed.). The committee accepted the hearing officer's reasoning that most of the various charges had been proved by clear and convincing evidence. The committee noted the hearing officer's comment that there was an apparent lack of venality on the clerk's part, that she was zealous, and that in certain matters her motives were meritorious. The committee also noted problems and stresses caused by circumstances of funding and staffing in the judicial system. It concluded, however, that the uncontested facts overwhelmingly established that the clerk had engaged in misconduct as generally alleged, inimical to the public good, requiring that she be removed from office. We agree with this recommendation.

Our statutory authority concerning the removal of the clerk is stated in G. L. c. 211, § 4. A majority of the Justices, upon a summary hearing or otherwise, may remove a clerk of a District Court upon a complaint "if sufficient cause is shown therefor and it appears that the public good so requires." This court last discussed the question of the removal of a clerk of court in *Massachusetts Bar Ass'n* v. *Cronin*, 351 Mass. 321 (1966). We observed that a clerk of court was a public officer with highly important official functions. *Id.* at 325-326. We characterized the court's role and the office of clerk as follows:

"Our function is to ensure the integrity of the judicial system, which must not only be beyond suspicion but must appear to be so. The duties of a clerk of a court are performed, for the most part, under public scrutiny. He is a conspicuous figure in the court room. He is

seated prominently near the judge, where he is in frequent consultation with him as well as with various lawyers. He administers oaths to witnesses. In our opinion, it would be incongruous to hold out as clerk one who has not conformed to the standards essential to every court." *Id.* at 326.

Removal proceedings involving other public officials pursuant to G. L. c. 211, § 4,[2] and disciplinary proceedings involving judges and lawyers provide us little guidance in reaching a conclusion on the facts presented in this proceeding. The fact that some persons removed from public office engaged in more egregious conduct than did the clerk does not help us answer the questions before us. We are left to assess the clerk's wrongdoing to see whether there is sufficient cause for her removal and whether the public good so requires.

The grounds for the removal of the clerk from office arise not from a single incident or even from a handful of incidents. They derive from a large number of events, representing varying degrees of improper conduct, which combine both to provide sufficient cause for the removal of the clerk and to demonstrate to our satisfaction that the public good requires her removal. In general terms, the clerk's abuses of her authority, on which we base our decision and which were manifested in the course of her duties as clerk, involved favoritism, lack of impartiality, improper treatment of court personnel and others, failure to follow lawful directions, refusal to permit certain matters to be heard, denial to news reporters of access to public records, and use of court personnel to perform personal services for her. We may not properly weigh each category of wrongful conduct in isolation,

---

[2]Other § 4 cases have involved serious criminal misconduct, see, e.g., *Massachusetts Bar Ass'n* v. *Cronin*, 351 Mass. 321 (1966); *Attorney Gen.* v. *Flynn*, 331 Mass. 413 (1954) (district attorney); *Attorney Gen.* v. *Pelletier*, 240 Mass. 264 (1922) (district attorney); *Attorney Gen.* v. *Tufts*, 239 Mass. 458 (1921) (district attorney), or insanity, see *Attorney Gen.* v. *O'Brien*, 280 Mass. 300 (1932) (register of probate and insolvency); *Commonwealth* v. *Cooley*, 1 Allen 358 (1861) (district attorney).

and thus we need not decide what discipline would be appropriate if each category of misconduct stood alone. See *Matter of Luongo, ante* 308, 312 (1993). The collective impact of her transgressions demonstrates that the clerk's misuse and abuse of her authority require that she no longer exercise the powers of the office of the clerk of the Northampton District Court.

We shall discuss the various categories of improper conduct on which the committee and the hearing officer relied in arriving at their conclusions that the clerk should be removed from office. We shall not repeat the details of the hearing officer's findings. We shall rather describe the kinds of wrongful conduct that the hearing officer found and give some specific examples of that conduct.

*Favoritism.* The clerk gave special favorable treatment to certain selected people in the disposition of civil motor vehicle infraction citations. Starting in 1988, the clerk created lists from time to time for the special handling of civil motor vehicle citations involving persons selected by her or by others whom she permitted to make such selections (such as clerk's office staff and police officers). If someone asked her to give special attention to a particular citation, the clerk would often have the citation placed on a special treatment list. Before 1990, the clerk on occasion simply disposed of a list on a particular day without sending any notice of a hearing. In 1990 and thereafter, notice was given that certain citations would be treated as "consideration" tickets at a hearing on a particular date and that the police officer who issued the citation need not appear unless the officer objected to the treatment of the citation as a "consideration" matter.[3] In the vernacular, the clerk was "fixing tickets" for certain favored persons, although she abhorred the use of the word "fix," preferring to use the word "consideration."

---

[3]The hearing officer added the following: "I infer from this that no encouragement was given to the officer to attend, particularly where by the very tenor of the notice, i.e. that these citations were being given special attention or consideration, it would seem unlikely that his presence was being sought by the Clerk."

The clerk also favorably disposed of individual civil motor vehicle citations. Without a hearing or placing the citation on any list, she entered a finding of "not responsible" for the wife of an attorney and for a cousin of an employee in the clerk's office.

We agree with the hearing officer's conclusion that the clerk's special consideration of certain civil motor vehicle citations was "destructive of the public's confidence in the integrity of the administration of justice." He correctly characterized the clerk's conduct as wilful and prejudicial to the administration of justice and clearly unacceptable.[4]

*Lack of impartiality.* In various matters the clerk displayed a lack of impartiality that, as the hearing officer put it, "was at the very least conduct unbecoming a clerk-magistrate that brings that office into disrepute." For example, the clerk and an attorney had strong disagreements concerning the handling of an estate of which the clerk and the attorney were coexecutors. She instructed her staff that all papers received from the attorney were to be placed at the bottom of the pile and not dealt with in a timely fashion. The clerk also had a disagreement with counsel for the chief beneficiary of the estate. She directed that that attorney's papers also be placed at the bottom of the pile. One day in February, 1989, when this attorney was in the clerk's office, the clerk screamed at everybody in the office that nobody other than herself was ever to talk to him without her permission. On another occasion, the clerk pressed an assistant district attorney about what could be done about a complaint that had

---

[4]He expanded on this matter as follows: "The bedrock of the statute (G. L. c. 90C) decriminalizing certain motor vehicle infractions and establishing a unique civil procedure for their disposition is that the procedure is open to all citizens on the same basis. To permit a clerk-magistrate or her staff to depart from required procedure to dispose of certain citations for a favored few, or to establish a select list for the irregular processing and disposition of certain citations at the behest of the clerk-magistrate, his or her staff, or others with courthouse connections, is clearly subversive of the integrity of the judicial system. The mere appearance that influence in the clerk's office is being exercised cannot be countenanced."

been sworn out against the next door neighbor of a chairman of a legislative committee.

*Improper treatment of others.* The hearing officer summarized the evidence concerning the way in which the clerk mistreated others, concluding that the evidence was overwhelming that, on many occasions, the clerk demeaned and yelled at or insulted, or was discourteous, impatient or rude toward her staff, judges, litigants, lawyers, and members of the public. She "criticized members of the staff to the point that they felt belittled, embarrassed, humiliated, and offended. Much of the strain and stress in the office was due to the unpredictability of her temperamental outbursts and her volatile nature. All of this led to an often unproductive and unprofessional environment. Such conduct and behavior are clearly prejudicial to the administration of justice, and misconduct unbecoming a clerk-magistrate that brings that office into disrepute. After the Chief Justice [of the District Court Department] had admonished her as to future conduct toward the staff and the general public, she continued from time to time to offend in that regard. Her attitude toward the First Justice, and the tone of her many writings to him, went beyond an honest and understandable disagreement as to objectives and procedures, and verged into the personal and the insulting, with no apparent deference to their respective positions in the courthouse. Her conduct toward some other judges . . . bordered upon — if it did not reach — the contemptuous."

The findings discuss two distinctly different portraits of the clerk. On the one hand, there was a person who by background, training, and experience was clearly qualified for the position. She was interested in court administration and resolved to remedy deficiencies in the clerk's office. She pushed her staff, but could be very caring about them and personally friendly with many of them. Many lawyers considered her to be a firm but fair administrator and adjudicator. On the other hand, she often presented an entirely different personality, and it was unpredictable which version she would present at any given time. "Her mood would change rapidly,

and almost without warning she would scream and yell at the staff, or individual members, belittling or berating them, particularly if she felt they were not doing their job. Sometimes this took place in the hearing of the public. As one witness put it 'She would be very pleasant, and two minutes later she could be a banshee.' She could be petty; she could be acerbic. Toward persons who came to the clerk's office for assistance or to make inquiry, her conduct was equally unpredictable and inconsistent, reflecting her erratic temperament." Her relationship with the presiding justice was inconsistent and at times stormy. "[T]he Clerk's primary motivation was to make the system work, as *she* believed it should work. The means and methods she chose to accomplish that laudable end were, however, often confrontational, ill-advised and counterproductive. Her mood-swings, as manifested by what she said and did, were frequent enough to create a serious morale problem among the staff; and occurred often enough that they could not fairly be classed as mere aberrational conduct."

*Other charges.* The hearing officer found that other charges against the clerk were proved. On several occasions the clerk failed to comply with the laws of the Commonwealth, rules of court, and the lawful directives of the Chief Justice of the District Court Department. Without lawful authority, she on occasion directed persons charged with civil motor vehicle violations to perform community service as a means of disposing of civil motor vehicle citations and applications for complaints. She refused to comply with the Chief Justice's directive to audiotape and log hearings.

On several occasions the clerk failed to carry out her responsibilities by refusing to schedule required hearings and refusing to process small claims cases and other procedures. "[A] substantial factor in [her] refusal was the Clerk's hope that by such tactic and the resulting publicity the clerk's office might receive additional funding, staffing and equipment."

The clerk failed to provide the press access to court records that were public. "She did this at least in part to

induce the newspaper to print articles favorable to her contention that her office was understaffed and underequipped, in the hope that the publicity would assist in obtaining additional funding . . . ." Again, as the hearing officer noted, "highly questionable if not clearly improper means" were used toward laudable ends.

The clerk used members of her staff to perform personal tasks for her, improperly granting compensatory time off when the tasks were performed after hours. The hearing officer correctly noted that "[i]t is the appearance of impropriety, as much as the reality, that is important in these matters, however; and the manner in which she demanded or allowed the staff to serve her private interests to the extent she did certainly tends to bring the office of clerk-magistrate into disrepute, and subverts the best interests of the administration of justice."

The clerk failed to or refused to cooperate with other employees in the courthouse when cooperation was reasonably necessary or beneficial to the administration of justice. The hearing officer recited details of several incidents in which the clerk was insulting to judges who reasonably sought the clerk's assistance in the performance of their judicial duties.[5]

*Conclusion.* The clerk's misconduct requires that we remove her from office. She established and for years maintained procedures for the favorable treatment of certain people charged with civil motor vehicle violations, people who were specially selected by her and by others authorized by her. This systematic, long-continuing, and uneven administration of the law alone warrants the imposition of serious discipline. The public's confidence in the administration of justice has to be greatly shaken by the disclosure that "well-

---

[5]One charge involved alleged misconduct by the clerk as coexecutor of an estate. The hearing officer and the committee concluded that this was a matter better left to the Board of Bar Overseers. We agree. In her brief, the clerk states that she has been subject to disciplinary action by the Board of Bar Overseers. We do not know whether that disciplinary action related to this charge, but, based on an allegation in a pleading filed by the clerk, it appears that it did.

connected" people could obtain undeserved special treatment from the clerk's office of the Northampton District Court.

The clerk, moreover, used the power of her office to retaliate against attorneys with whom she had disagreements, to seek special treatment for particular individuals, to mistreat and humiliate employees of the clerk's office and members of the public, and often to insult the presiding justice of the court and other judges. She refused to comply with lawful directives of the Chief Justice of the District Court, declined on occasion without good reason to schedule hearings and to process small claims cases, refused the press access to public records, and declined to cooperate with judges who reasonably asked her to assist them.

On this 2d day of December in the year of our Lord one thousand nine hundred and ninety-three, by and before the Justices of the Supreme Judicial Court, after consideration of the record presented by the Committee on Professional Responsibility for Clerks of the Courts and after hearing, it appearing that sufficient cause is shown for the removal of Janet Rowe Dugan from the office of clerk of the Northampton Division of the District Court Department and that the public good requires her removal, it is determined that Janet Rowe Dugan be, and she hereby is, removed from that office.