## In the Matter of Clerk-Magistrate Robert E. Powers.

Suffolk. January 8, 2013. - May 10, 2013.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Clerk of Court. District Court,* Clerk-Magistrate. *Supreme Judicial Court,* Removal of clerk of court. *Practice, Civil,* Proceeding for removal of clerk of court. *Due Process of Law.*

In light of the crucial role played by clerk-magistrates in the administration of justice in the District Courts [65-69], this court concluded, after considering the totality of the circumstances, that the public good required that a clerk-magistrate be removed from his position [82-86], where he failed to devote the entire time during normal court hours to his duties [69-72]; where a pattern of habitual intemperance toward court personnel, litigants, family members, and attorneys, in frequency and degree, demonstrated what was in essence a continual abuse of authority, not an occasional lapse of judgment [72-76]; and where he failed diligently and timely to carry out his duties [76-78].

This court concluded that, although the Committee on Professional Responsibility for Clerks of the Courts (committee) violated its rules by failing to honor the request of a clerk-magistrate to appear before the committee prior to its filing of formal charges against him, the clerk-magistrate was not thereby deprived of due process, where he had a full and fair hearing before the committee made any findings or recommendations and before any meaningful deprivation occurred, and where the clerk-magistrate did not suffer unfair prejudice. [78-82]

Formal charges filed in the Supreme Judicial Court on December 19, 2011.

*Peter J. Haley* for the respondent.

*Thomas O. Bean (Robert W. Langlois* with him) for Committee on Professional Responsibility for Clerks of the Courts.

*Harry Spence,* court administrator of the Trial Court, amicus curiae, submitted a brief.

Gants, J. The Committee on Professional Responsibility for Clerks of the Courts (committee) has filed formal charges against the respondent, Robert E. Powers, clerk-magistrate of the Barnstable Division of the District Court Department

(Barnstable District Court), alleging three counts. In the first count, the committee alleges that Powers "typically arrived one to two hours late, and thus did not contribute to the work of the Clerk's office or the leadership of his staff during the busiest hour of the office day," in violation of the Code of Professional Responsibility for Clerks of the Courts (code), S.J.C. Rule 3:12, Canon 3, first par., as appearing in 407 Mass. 1301 (1990).[1] The second count alleges that "Powers has willfully, grossly, and continuously failed to maintain order and decorum in proceedings he presided over and to be patient, dignified, and courteous to litigants, lawyers, staff, judges and others in his official dealings," thus creating "the perception in the community that the Barnstable District Court is not a place to go to be treated fairly and to receive orderly administration of justice," in violation of Canons 3 (A) (2) and (A) (3).[2] The third count alleges that Powers was "grossly delinquent in performing administrative duties" and "has willfully, grossly, and continuously failed to promptly issue decisions for matters that are heard by him," in violation of Canons 3 (A) (5) and (B).[3]

---

[1] The first paragraph of Canon 3 of the Code of Professional Responsibility for Clerks of the Courts (code), S.J.C. Rule 3:12, as appearing in 407 Mass. 1301 (1990), provides, in pertinent part: "A Clerk-Magistrate shall devote the entire time during normal court hours to the duties of his or her office, but may, according to established procedures, participate during that time in law-related educational and public service activities."

[2] Canon 3 (A) of the code provides:

"In the performance of adjudicative and administrative responsibilities, the following additional standards shall apply: . . .

"(2) A Clerk-Magistrate should seek to maintain order and decorum in proceedings.

"(3) A Clerk-Magistrate should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others in official dealings . . . ."

[3] Canon 3 (A) (5) of the code provides, in part: "A Clerk-Magistrate should diligently carry out his or her [adjudicative and administrative] responsibilities and should dispose of them promptly."

Canon 3 (B) of the code provides, in part:

"A Clerk-Magistrate should diligently discharge administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities

After a six-day hearing, a hearing officer found by clear and convincing evidence that Powers had committed the alleged violations of these canons of the code, and concluded that "the public good justifies his removal from office under G. L. c. 211, § 4." The committee adopted the findings of the hearing officer, and a majority of the committee adopted his recommendation that Powers be removed from his position of clerk-magistrate of the Barnstable District Court.[4] In accordance with rule 8 (M) of the Rules of the Committee on Professional Responsibility for Clerks of the Courts (rules), see S.J.C. Rule 3:13, as appearing in 407 Mass. 1308 (1990), the committee forwarded its decision and recommendation to this court to "take such action as the [c]ourt may direct." We accept the hearing officer's findings of violations of these canons, as adopted by the committee, and conclude that the public good requires that Powers be removed from his position.[5]

*Discussion.* We begin by detailing the crucial role played by clerk-magistrates in the administration of justice in the District Courts of the Commonwealth.[6] Next, we evaluate the evidence regarding Powers's alleged misconduct, and determine whether we should accept the committee's adoption of the hearing officer's findings of violations of the specific canons. We then

---

of other court officials. In so doing, a Clerk-Magistrate should be cognizant of the need to employ efficient, businesslike methods and sound practices. A Clerk-Magistrate should organize and manage the business of the Clerk-Magistrate's Office with a view to the prompt and convenient dispatch of the business of the court."

[4]A minority of the Committee on Professional Responsibility for Clerks of the Courts (committee) recommended that Robert E. Powers receive a lengthy suspension without pay and be supervised in the performance of his duties for several years.

[5]We acknowledge the amicus letter filed by the court administrator of the Trial Court.

[6]Although Canon 1 of the code, S.J.C. Rule 3:12, Canon 1, as appearing in 407 Mass. 1301 (1990), adopts a broad definition of "Clerk-Magistrate" that encompasses "anyone serving in the position of Clerk-Magistrate, Clerk, Register, Recorder, Assistant Clerk-Magistrate, Assistant Clerk, Assistant Register, or Deputy Recorder, Judicial Case Manager or Assistant Judicial Case Manager . . . whether elected or appointed, and whether serving in a permanent or temporary capacity," our discussion is limited to those clerks appointed by the Governor pursuant to G. L. c. 218, § 8, and given the title of a magistrate pursuant to G. L. c. 221, § 62B.

address why the public good requires Powers's removal from office.

1. *Responsibilities of a clerk-magistrate in a District Court.* Pursuant to G. L. c. 218, § 8, "[e]ach district court shall have a clerk," and "[a]ll such clerks shall be appointed by the [G]overnor with the advice and consent of the [Governor's Council]." All clerks of District Courts also hold the title of magistrate. G. L. c. 221, § 62B. The responsibilities of the appointed clerk-magistrates of the various District Courts are "inextricably related and essential to the effective functioning of the courts in this Commonwealth." *Commonwealth* v. *Clerk-Magistrate of the W. Roxbury Div. of the Dist. Court Dep't*, 439 Mass. 352, 359 (2003).

The clerk-magistrate performs many roles that are crucial to the fair and efficient administration of justice in a District Court. First, a clerk-magistrate has substantial adjudicative responsibilities. In criminal matters, a clerk-magistrate reviews applications for search warrants and arrest warrants for probable cause. See G. L. c. 218, § 33. When a police officer makes an arrest without a warrant, a clerk-magistrate determines whether a criminal complaint shall issue on probable cause. See *District Attorney for the Norfolk Dist.* v. *Quincy Div. of the Dist. Court Dep't*, 444 Mass. 176, 185-186 (2005). When a person who is not a police officer applies for a misdemeanor criminal complaint, the clerk-magistrate conducts a "show cause" hearing to determine if probable cause exists for the commencement of criminal proceedings. See G. L. c. 218, § 35A; *Commonwealth* v. *Clerk-Magistrate of the W. Roxbury Div. of the Dist. Court Dep't, supra* at 356. These show cause hearings "will often be used by a clerk-magistrate in an effort to bring about an informal settlement of grievances, typically relating to minor matters involving 'the frictions and altercations of daily life.' " *Id.*, quoting *Bradford* v. *Knights*, 427 Mass. 748, 751 (1998).

In civil matters, a clerk-magistrate decides "small claims" cases commenced under G. L. c. 218, §§ 21 and 22, where $7,000 or less is at issue; civil motor vehicle infraction hearings, see G. L. c. 221, § 62C (*e*); and appeals of certain municipal bylaw violations, see, e.g., G. L. c. 40U, § 15 (municipal fines). In most of these cases, the litigants represent

themselves and know little of the applicable law or court pro-
cedures, so a clerk-magistrate must provide "meaningful access
to the court system for litigants who, due to financial constraints
or lack of familiarity with the legal process, might not otherwise
be in a position to vindicate their rights." See *Travis* v.
*McDonald*, 397 Mass. 230, 233 (1986).[7] See also Supreme
Judicial Court Steering Committee on Self-Represented Liti-
gants, Serving the Self-Represented Litigant: A Guide by and
for Massachusetts Court Staff 2-3 (2010) (Serving the Self-
Represented Litigant).

Second, as the judicial officer in charge of the clerk's office,
a clerk-magistrate has substantial management responsibilities.
G. L. c. 218, § 8 (clerk-magistrate responsible for "internal
administration" of clerk's office). Clerk-magistrates have the
power to appoint staff, including assistant clerks, G. L. c. 211B,
§ 10B (*a*); are responsible for the performance of all clerk's of-
fice personnel, G. L. c. 218, § 8; and must address the various
personnel issues that come with managing a staff. *Id.* Clerk-
magistrates maintain "all records, books and papers" filed in
"their respective offices," G. L. c. 218, § 12, and must make
available public documents on request and keep impounded
documents under seal. See Canon 3 (A) (6) of the code ("Clerk-
Magistrate shall facilitate public access to court records"); rule
9 of the Uniform Rules on Impoundment Procedure, Mas-
sachusetts Rules of Court, at 611 (West 2012). Under the direc-
tion of the clerk-magistrate, the clerk's office keeps the docket
of each case, and is responsible for its completeness and accuracy.
Clerk-magistrates also manage public funds by collecting fines,
forfeitures, probation supervision fees, and court fees and costs.
See G. L. c. 218, § 12.

Third, clerk-magistrates, or assistant clerks under their direc-
tion, assist judges in the management of a court session. They

---

[7]In addition to the duties outlined above, the authority of a clerk-magistrate
includes "the power to grant continuances; to hear and rule on uncontested
nonevidentiary motions; to hold pretrial conferences; . . . to hold preliminary
hearings to determine whether there is probable cause to believe that a
probationer has violated the terms of his probation; . . . and to set bail in
certain circumstances." *State Bd. of Retirement* v. *Bulger*, 446 Mass. 169, 176
(2006), quoting *First Justice of the Bristol Div. of the Juvenile Court Dep't* v.
*Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't*, 438 Mass.
387, 398 (2003).

call cases, administer oaths to witnesses, and issue witness summonses and warrants. See G. L. c. 218, § 33; *State Bd. of Retirement* v. *Bulger*, 446 Mass. 169, 176 (2006) (*Bulger*). They are so indispensable to the efficient administration of a court session that in the Barnstable District Court, as in most courts, judges would not begin the call of cases unless a clerk-magistrate or assistant clerk was present in the court room to assist them.

Fourth, as former District Court Department Chief Justice Lynda M. Connolly testified during the hearing, the clerk's office is "the first port of call when individuals come to the court." The clerk's office provides people with direction as to where they should report in the court house and when. The clerk's office also provides information (as opposed to legal advice) to persons seeking restraining orders or other relief from the court as to how the court system works, what they need to file, and how to complete court forms. See Serving the Self-Represented Litigant, *supra* at 3-4. Further, the clerk's office provides language assistance to those seeking legal redress who are unable to speak, understand, or read English. See, e.g., Small Claims Standard 2:05, Massachusetts Rules of Court, *supra* at 553 (clerk-magistrate to provide interpreters); Serving the Self-Represented Litigant, *supra* at 7 (court staff permitted to act as "scribes" when litigant unable to complete form due to language barrier). In addition, the clerk's office provides self-represented litigants with information about the availability of trial court libraries, and how to contact lawyer referral services or legal aid programs to obtain legal advice. See Serving the Self-Represented Litigant, *supra* at 4-6. Because of the many interactions with the public, Chief Justice Connolly correctly recognized that the clerk-magistrate is in a sense "the face of the District Court."

Finally, in a well-functioning court house, the clerk-magistrate, along with the presiding justice of the District Court and the chief probation officer, comprise in essence the court house senior management team, working collaboratively to ensure the fair, effective, and efficient administration of justice.

In recognition of the vital function played by clerk-magistrates in promoting public trust in the judicial system, this court promulgated the code to establish the "high standards" govern-

ing the "norms of conduct and practice" associated with the clerk's office. *Bulger, supra* at 177-178. See Canon 1 of the code, S.J.C. Rule 3:12, as appearing in 407 Mass. 1301 (1990).

> "[T]he code imposes on a clerk-magistrate a significant responsibility for upholding the integrity of the judicial system, for promoting public confidence in the administration of justice, for honoring the public trust placed in such office, for avoiding the appearance of any impropriety in his activities, and for fulfilling the mandates of the oath of office."

*Bulger, supra* at 177.

2. *The findings of violation.* Against this backdrop, we now turn to the findings made by the hearing officer and adopted by the committee. "[W]e accept the hearing officer's specific findings of fact unless they are clearly erroneous, unwarranted, or otherwise tainted by error of law." *Matter of Antonelli*, 429 Mass. 644, 648 (1999). We defer to the hearing officer's conclusions regarding the credibility of the witnesses, and recognize that "[i]t is not necessary that each fact supporting an allegation be found by clear and convincing evidence but only that the allegation of an ethical violation be proved by clear and convincing evidence." *Id.* We address each count of the formal charges.

a. *Count 1: Failure to devote the entire time during normal court hours to the duties of clerk-magistrate.* The hearing officer found that the normal hours of the Barnstable District Court are from 8:30 A.M. until 4:30 P.M. Although court sessions are not scheduled to begin until 9 A.M., the clerk's office is busiest between 8:30 A.M. and 9:30 A.M. Marion E. Broidrick, who was an assistant clerk in the Barnstable District Court and presently serves as the clerk-magistrate in the Orleans Division of the District Court Department, in her testimony described the first hour of the day as "almost like doing triage in an emergency room." Early in the morning, members of the public who have business in court that day seek information from the clerk's office concerning when and where their matter will be heard. Others are seeking restraining orders or filing small claims complaints, petitions for mental health confinements, or applications for criminal complaints before they go to work. Defendants in

custody are being brought in, who may have medical or other issues that require attention or treatment. Police prosecutors seek the issuance of complaints for arrests made the previous evening or, on Monday morning, arrests made over the weekend. The first hour in the morning is also when the clerk-magistrate generally confers with the presiding justice to plan for the court day and address logistical problems.

Yet, the hearing officer found that Powers "almost never arrived at 8:30 A.M., rarely before 9:30 A.M., and usually not until between 9:45 A.M. and 10:15 A.M." In his testimony at the hearing, Powers admitted that "[t]he majority of the time" he did not arrive at the Barnstable District Court before 9:30 A.M. from January, 2007 (when he began serving as a clerk-magistrate), through May, 2011. In fact, he admitted that he continued his chronic tardiness even after he was verbally told that he needed to arrive to work on time by Chief Justice Connolly; Regional Administrative Justice Rosemary Minehan, whose region included the Barnstable District Court; the presiding justice of the Barnstable District Court, Judge W. James O'Neill; and Philip McCue, who at the time was the director of operations of the District Court Department. He also admitted that he did not arrive to work on time even after Judge O'Neill came to his office early in 2010 to tell him that one of his assistant clerks, Charles Ardito, had been named acting clerk-magistrate in another division and that he would be left with only one assistant clerk. Instead, when Judge O'Neill told Powers he would need to get to work on time and "roll up [his] sleeves," Powers admitted that he raised his voice and, in effect, told the judge, "Who are you to come into my office and tell me what to do," and reminded the judge that he had been appointed by the Governor to be the clerk and would decide how the clerk's office would be run.[8] It was only in June, 2011, after this court appointed a special counsel to assist the committee in investigating allegations of Powers's misconduct and after Chief Justice

---

[8]The hearing officer found that Powers was yelling at Judge O'Neill and that Powers's face was flushed. He also found that anyone in the clerk's office could hear Powers's angry confrontation because the door to Powers's office was open. The hearing officer found that this was one of the incidents of intemperate behavior that formed the basis for his finding of a violation of Canon 3 (A) (3) of the code as alleged in the second count. See *infra*.

Connolly had suspended Powers for two weeks, that he routinely arrived at work at 8:30 A.M.

Even after formal charges issued in this case, Powers testified at his deposition that it was "debatable" whether he was required to be in the clerk's office by 8:30 A.M. We conclude that it is not debatable; the first paragraph of Canon 3 of the code provides that, except for "law-related educational and public service activities," a clerk-magistrate "shall devote the entire time during *normal court hours* to the duties of his or her office" (emphasis added). As a result of his chronic tardiness, others in the clerk's office had to perform all the work during the busiest time of the day. Court sessions often did not begin until 9:30 A.M. because the assistant clerks who served in the sessions had to complete the early morning "triage" work in the clerk's office before they could call the list in the session. The hearing officer found that Powers's practice of habitually arriving late "was demoralizing to the staff of the [c]lerk's office, interfered with the efficient operation of the court and put the public reputation of the court system at risk."

The hearing officer did not dispute Powers's contention that he habitually remained at work after the court house closed at 4:30 P.M. and put in a daily eight-hour day, but found that, "given the particular needs of a district court where its business is front loaded to the beginning of the court day, his staying late did not solve the problems of the court created by his habitual lateness in arriving." The hearing officer also acknowledged that Powers testified that he suffers from multiple sclerosis and that he claimed that his illness contributed to his chronic tardiness, but the hearing officer found Powers's excuse "difficult to evaluate" because he offered no medical evidence.[9] We note that Powers's illness has not prevented him from arriving to work on time since June, 2011, and that, in his statement to the committee, Powers declared that he was not offering "that as an excuse to some of [his] lateness issues."

Based on these facts, we conclude that the finding made by the hearing officer and adopted by the committee, that clear and

---

[9]The hearing officer also considered evidence of Powers's long commute from his home, but concluded that "it is plain that these circumstances cannot excuse his conduct." We agree.

convincing evidence established that Powers violated the first paragraph of Canon 3, is not clearly erroneous.

b. *Count 2: Habitual intemperance.* The hearing officer concluded by clear and convincing evidence that Powers violated Canon 3 (A) (3) of the code "in that he on numerous occasions was not patient, dignified, and courteous to litigants, . . . witnesses, lawyers and others in official dealings," and that Powers violated Canon 3 (A) (2) in that, "by his intemperate[,] demeaning[,] disrespectful[,] and explosive conduct," he did not maintain order and discipline in court proceedings. The hearing officer acknowledged the evidence offered by Powers that he had often acted appropriately and professionally in conducting hearings and carrying out his other duties, and determined that there were many cases in which he had. But the hearing officer also concluded:

> "The clear and convincing weight of the credible evidence was that his lack of patience[,] courtesy[,] and dignity was not the merely aberrant incidence of a 'bad day' or due to unacceptable provocation. He was entirely capable of acting appropriately and controlling his temper and speech but did not do so on a regular basis. Furthermore[,] throughout his tenure when complaints about his demeanor and personal interactions were brought to his attention he did not admit or take responsibility for his actions. He attributed the complaints to those of disappointed litigants or 'crazy' people."

The hearing officer found five incidents where Powers had mistreated persons who either were clerk office employees or contractors providing judicial support services; four where he inappropriately and angrily yelled at a judge; two where he inappropriately and angrily yelled at litigants who were seeking assistance at the clerk's office; and nineteen where he acted inappropriately at a court hearing toward litigants, their parents, or their attorneys, sometimes denying them an adequate opportunity to be heard.[10] We summarize only the most egregious incidents.

---

[10]We do not include an incident involving John Mulvey, counsel for the office of the jury commissioner, in February, 2011, because this incident was not alleged in the formal charges.

i. *Mistreatment of court personnel.* After serving for twenty-two years as a probation officer, court administrator, and eventually clerk-magistrate of the Dorchester Division of the District Court Department, Richard Dwyer agreed after his retirement to work two or three days per week in the Barnstable District Court as a per diem assistant clerk. Under the previous clerk-magistrate, he had conducted criminal hearings, civil motor vehicle infraction hearings, and small claims hearings, and assisted the staff with administrative duties. After Powers became the clerk-magistrate, Powers issued an order dated February 9, 2007, in which Dwyer was given no responsibilities to conduct any hearings except as the second backup for small claims hearings. Dwyer told Powers on February 22, 2007, that it appeared from Powers's directive that he did not want him around anymore and offered to leave, but said he would be glad to cover for assistant clerk Ardito for a few weeks while Ardito was on vacation. Powers flew into a rage, and yelled that he was the clerk, he was appointed by the Governor, and no one would tell him what to do. Others in the clerk's office heard Powers erupting at Dwyer and were demoralized by the encounter. The hearing officer recognized that Powers had the authority to terminate Dwyer and that his termination was not a basis for discipline, but found that Powers's treatment of Dwyer was "rude, demeaning, loud, verbally violent and well outside the limits of civil conduct."

Denise Messier, a licensed independent clinical social worker employed by a nonprofit organization, conducted mental health and substance abuse evaluations of individuals at the request of judges or probation officers in the Barnstable District Court. Before Powers became the clerk-magistrate, Messier had used a vacant office in the clerk's office to conduct interviews, but shortly after Powers became clerk-magistrate, he told her that he did not want her to have any contact with any employee of the clerk's office and that she could not use the vacant office or the clerk's office copier or facsimile machine. After speaking with Judge O'Neill, she was allowed to speak with the two assistant clerks who dealt with mental health cases and was allowed use of the clerk's office copier and facsimile machine, but was denied the use of any office space in the clerk's office.

Two years later, she was in the clerk's office to use the facsimile machine when Powers ordered her into his office and screamed at her, "Do you remember what I told you?" She turned to leave and he followed her, continuing to scream at her and pointing his finger at her. She walked into the judge's lobby for protection, and was unable to function the rest of the day. She testified that she tried to continue working at the court after that, but "had a difficult time," and no longer provides mental health services for the court.[11] The hearing officer found his conduct towards her "beyond the bounds of civility."

Deborah Fish, the head of Cape Cod Mediation Service, provided volunteers to mediate small claims matters at the Barnstable District Court. Late in the morning on May 18, 2011, while conducting a small claims session, Powers sent a case to mediation but was told that it was too late to take any more cases that day. Powers walked out of the session and, as found by the hearing officer, "commenced an angry, verbally violent confrontation with [Fish], yelling at her and standing within one foot of her person." Powers's face was red and contorted, and he spoke in a very loud voice, so loud that it was heard by clerk's office staff and members of the public. After his tirade he summarily dismissed the Cape Cod Mediation Service from conducting any further duties at the court house, and announced its termination to all present in the small claims session. When Chief Justice Connolly spoke with him about this incident on May 31, he denied that there was any kind of explosive outburst, but after he had been suspended and had learned that his conduct was under investigation by the committee, he made a written apology to Fish and reengaged the Cape Cod Mediation Service.[12]

---

[11]Judge O'Neill in his testimony noted that Denise Messier had screened all the mental health and substance abuse applications under G. L. c. 123, §§ 12 and 35, before a warrant of apprehension would issue, and would routinely speak with the family members who were seeking such a warrant and sometimes explain to them the availability of less restrictive alternatives. He explained that these applications have become a significant burden to the court; in 2012, there had already been, as of April 10, seventy-one or seventy-two such applications in the Barnstable District Court. When Powers told Messier she could no longer use the clerk's office, Judge O'Neill tried to explain to Powers the importance of the services she provided, but Powers did not appear to understand.

[12]The hearing officer found that Chief Justice Connolly informed Powers

ii. *Intemperance towards litigants, family members, and attorneys.* In the spring of 2007, attorney Joseph Duffy represented a sixteen year old client at a show cause hearing who was accused of filing a false complaint of sexual misconduct. After the State police trooper presented the prosecution case, Duffy attempted to present his client's case but was interrupted by Powers, who told Duffy that he found probable cause and that his client had no case, even though Duffy had yet to present his client's case. The hearing officer found that Powers "became very agitated, impatient, red in the face and forceful in his gestures and mannerisms."

Lisa Conrad conducted a small public relations business on Cape Cod and occasionally filed statements of small claims to collect unpaid debts. In early 2008, she brought a small claims case against two men of Brazilian descent who had failed to provide the promised services in a barter arrangement. They admitted that Conrad had done the work promised and that they had not reciprocated, but when they attempted to explain and present a defense, Powers interrupted, demeaned and belittled them, and commented on their nation of origin. Although they spoke and understood English, Powers told them they would need to improve their English if they were to succeed.[13]

In another case brought by Conrad in late 2009 or early 2010, she wrote "void" on a check given to her for partial payment where the payor had made clear that negotiation of the check would be deemed to constitute acceptance of payment in full. When Powers learned that she had refused partial payment, he commented that it must be nice to be able to afford not to accept a payment, and then became loud, rude, and impatient toward her, repeatedly interrupted her, and refused to allow her to present evidence. As a result of her experiences with Powers, Conrad no longer wants to resolve her disputes at the Barnstable District Court.

At a show cause hearing on May 13, 2008, on an application

on May 31 that he was suspended and instructed him to have no contact with the Barnstable District Court during his suspension other than to pick up his personal belongings and speak with Judge O'Neill. Despite this admonition, Powers presided over the small claims session on June 1.

[13]Lisa Conrad testified that, after ninety days had passed without notice of a decision, she telephoned the court and learned that she had lost.

for a criminal complaint for driving without a license, the father of the seventeen year old defendant apologized to Powers for his teenage son's behavior, stating that he had not been able to keep a close eye on him since his wife died of cancer. Powers became red in the face and, with a raised voice, called the father "a coward for using his wife's death from cancer" to try to protect his son from the issuance of a complaint.

At a show cause hearing on June 26, 2008, where cross-complaints were sought for assault and battery, attorney Peter Leveroni told his client where to sit, and Powers lost his temper and said that it was his court room and he would tell persons where they should sit. Later in the hearing, after Powers cut off Leveroni's cross-examination, Leveroni looked at him, and Powers, in a loud voice, asked whether Leveroni was "staring" at him and told Leveroni he was not afraid of him. The hearing officer found that Powers "spoke in the manner of someone who was challenging another for a physical fight."

On April 13, 2011, in a small claims case, Powers asked a litigant, Carole Wolfe, why she was not responding to his questions. She replied that he had told her "to shut up before." Powers denied having told her to shut up and asked her to show him on the tape recording where he had said that. She told him that he had the tape recording, not her. Powers replied, "Yeah, I got the tapes, and I'll fix it before we play it so it won't hear me saying 'shut up, Ms. Wolfe.' " The hearing officer found that, even if Powers had not told her to shut up, "his threat to alter the tapes was shockingly inappropriate and demeaning and disrespectful to Ms. Wolfe."

After conducting an independent review of the record, we conclude that the finding by the hearing officer and the committee of violations of Canons 3 (A) (2) and (A) (3) by clear and convincing evidence is not clearly erroneous. As did the hearing officer, we recognize that even the most temperate judge or clerk-magistrate may occasionally demonstrate impatience, frustration, or anger at litigants, colleagues, or staff, but we conclude that the pattern of conduct shown here, in frequency and degree, demonstrates what is in essence a continual abuse of authority, not an occasional lapse of judgment.

c. *Count 3: Failure diligently and timely to carry out the*

*duties of clerk-magistrate.* The hearing officer found that "[i]n many cases there was a substantial delay between the time [Powers] heard a matter and the time he issued and gave notice of his decision," which "supports the conclusion that he habitually did not render his decisions on a timely basis, in violation of Canon 3 (A) (5)." The hearing officer also found that Powers failed diligently to discharge his administrative responsibilities, in violation of Canon 3 (B), by being habitually absent at the beginning of the work day, by failing daily to deposit monies collected by the clerk's office in a local bank as required by the Trial Court policies and procedures manual, and by directing his staff not to send out notice where he denied the issuance of a criminal complaint after a show cause hearing. We conclude that the finding of violation of Canon 3 (B) is well supported by the evidence, where Powers admitted that he usually did not arrive at work until after 9:30 A.M. and did not cause the collected funds to be deposited daily, and where litigants asked Judge O'Neill on several occasions to allow a late-filed appeal of the denial of a criminal complaint because they had not received notice of the denial from the clerk's office. We also affirm the finding of violation of Canon 3 (A) (5), although we recognize this to be a closer call because, as the hearing officer noted, the finding of substantial delay is supported by "anecdotal" rather than "statistical" evidence.

The hearing record reflects little statistical analysis of the amount of time that passed between the date of a final hearing conducted by Powers and the date of decision. Powers elicited testimony that the formal charges alleged that, during the first quarter of 2011, he heard 230 small claims cases, decided seventy-six on the date of the hearing, and took an average of sixteen days to decide the remaining 154. There are no time standards that govern the time in which small claims cases should be decided from the date of *hearing*. The District Court time standards provide only that seventy-five per cent of small claims cases should be decided within two months from the date of *filing*, and all should be decided within four months of *filing*. Nor was any evidence presented as to whether the small claims cases decided by Powers were adjudicated within the time standards.

We conclude, however, that the hearing officer's finding that

"[i]n many cases" there was substantial delay between Powers hearing a case and giving notice of his decision was not clearly erroneous. The hearing officer credited evidence that reflected what can be characterized as Powers's consciousness of undue delay: he instructed employees in the clerk's office to change the date on the electronic docket in criminal cases from the date that he informed them of his decision to the date of the hearing, and asked them to do the same in small claims cases.[14] The hearing officer also credited testimony that Powers asked a case specialist in the clerk's office to telephone the attorneys of record in some older small claims cases because he could not recall what happened at the hearing.[15] There was other evidence, also credited by the hearing officer, that undecided cases would sit in Powers's office for thirty to forty-five days or longer, and that litigants would call to complain about how long it took for them to receive a decision, but the staff had difficulty responding to their inquiries because Powers had not given back the case file. A District Court judge who adjudicated small claims appeals in the Barnstable District Court testified that Powers's cases were often decided months after the hearing while Broidrick's cases were always decided within two weeks of the hearing. A former account clerk in the office testified that it sometimes took Powers three months to make decisions in civil motor vehicle infraction cases.

Consequently, based on our independent review of the evidence, we conclude that the finding by the hearing officer and the committee of violation of Canons 3 (A) (5) and (B) by clear and convincing evidence is not clearly erroneous.

3. *Due process challenge.* Before we consider the issue of sanctions, we address Powers's contention that the formal charges against him should be dismissed because his right to due process was denied by the committee's failure to honor his request to appear before the committee prior to formal charges being filed.[16]

Under the rules, there are two avenues by which the committee

---

[14]The computer system for small claims cases would not allow the staff to perform this backdating.

[15]The case specialist testified that she listened to the tape recordings of the hearings to avoid the embarrassment of asking the attorneys what had occurred.

[16]Before the commencement of his hearing, Powers filed with the hearing officer a motion to dismiss the formal charges and remand to the committee,

may issue formal charges against a clerk-magistrate. Under the first and longer avenue, if after an initial investigation and evaluation the committee finds that there is sufficient cause to proceed, the complainant shall be asked to file a signed, sworn complaint or, if no sworn complaint is obtained, the committee shall prepare a clear statement of the allegations. Rule 7 (A) (2) (c) of the Rules of the Committee on Professional Responsibility for Clerks of the Courts. The clerk-magistrate shall then immediately be served with the sworn complaint or statement of allegations. Rule 7 (B) of the Rules of the Committee on Professional Responsibility for Clerks of the Courts. "Within twenty-one days after the service . . . , the [clerk-magistrate] may file a written answer with the [c]ommittee and may request a personal appearance before the [c]ommittee. If the [clerk-magistrate] elects to appear personally, [the] statement shall be recorded." *Id.* "After the [clerk-magistrate's] answer and personal appearance, if any," the committee may terminate the proceeding and dismiss the complaint, issue a public reprimand or informal adjustment,[17] or "[i]f it finds by a preponderance of the credible evidence that there is sufficient cause to believe that there has been misconduct of a nature requiring a formal disciplinary hearing, the [c]ommittee shall issue formal charges against the [clerk-magistrate]." Rule 7 (C), (E) of the Rules of the Committee on Professional Responsibility for Clerks of the Courts. Under the alternative avenue, "[n]otwithstanding the procedures set forth in this Rule 7, the [c]ommittee may issue formal charges against the [clerk-magistrate] at any stage in the proceeding if the [c]ommittee finds that there is clear and convincing evidence of misconduct of a [clerk-magistrate] of a nature requiring a formal disciplinary proceeding." Rule 7 (F) of the Rules of the Committee on Professional Responsibility for Clerks of the Courts.

---

claiming that the committee was obliged to grant his request to appear before the committee before it filed formal charges. The hearing officer determined that he lacked jurisdiction to grant the relief requested. Powers then filed with this court an emergency motion to dismiss and remand to the committee, which was denied. We consider the issue de novo.

[17]Under an informal adjustment, with the agreement of the clerk, the committee "may admonish the [clerk-magistrate], direct professional counseling or assistance for the [clerk-magistrate], or impose conditions on the [clerk-magistrate's] future conduct." Rule 7 (E) (3) of the Rules of the Committee on Professional Responsibility for Clerks of the Courts.

The committee contends that there is a third avenue under the rules by which it may proceed without a complaint to the issuance of formal charges under Rule 7 (E) (4) based on a finding of misconduct by a preponderance of the credible evidence. The committee admits that it proceeded in this case down that third avenue by issuing formal charges under Rule 7 (E) (4) without first obtaining a sworn complaint or preparing a statement of allegations. We do not agree with the committee that there is a third avenue to the filing of formal charges. Under the rules, which we take this occasion to clarify, if the committee wishes to proceed to formal charges without first obtaining a sworn complaint or preparing a statement of allegations, and without serving the clerk-magistrate with the sworn complaint or statement of allegations, it must do so under Rule 7 (F) based on a finding of clear and convincing evidence of misconduct.

Powers on appeal does not claim that he was denied due process because of the absence of a sworn complaint or statement of allegations. Rather, he claims only that he was denied due process because the committee did not honor his request for a personal appearance before the committee filed formal charges, which denial he claims is contrary to Rule 7 (B). That rule allows a clerk both to file a written answer to the sworn complaint or statement of allegations and to "request a personal appearance." The committee claims its rules permit such a request, but impose no obligation to grant it. We disagree. While the rules do not explicitly require the committee to grant a request for personal appearance, they do so implicitly, unless the committee decides to proceed directly to formal charges under Rule 7 (F) based on clear and convincing evidence. Where, as here, the committee contemplated filing formal charges under Rule 7 (E) (4) based on a preponderance of the evidence, it should have honored Powers's request to appear before the committee and erred in failing to do so.

Although we conclude that the committee violated its rules by failing to honor Powers's request to appear before the committee before it issued formal charges under Rule 7 (E) (4), we do not conclude that Powers was thereby deprived of due process.[18] The statutory guarantees contained in G. L. c. 211,

---

[18] "[W]e have treated the procedural due process protections of the Mas-

§ 4, and G. L. c. 218, § 8, that clerk-magistrates shall hold office during good behavior and only be removed when the public good so requires suffice to create a constitutionally protected property interest such that Power's position as clerk-magistrate cannot be terminated without providing him the "opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Goldberg* v. *Kelly*, 397 U.S. 254, 267 (1970), quoting *Grannis* v. *Ordean*, 234 U.S. 385, 394 (1914), and *Armstrong* v. *Manzo*, 380 U.S. 545, 552 (1965). See *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 538-539 (1985) (public employees had constitutionally protected property interest when statute provided they could retain their positions "during good behavior and efficient service"). Under the process followed by the committee, Powers had a full and fair hearing, albeit after the filing of formal charges, but before the committee made any findings or recommendations and before any meaningful deprivation occurred. Such a procedure does not offend due process. See *Withrow* v. *Larkin*, 421 U.S. 35, 56 (1975) (administrative agencies may investigate, file charges, and then participate in ensuing hearing without violating due process); *Harris* v. *Trustees of State Colleges*, 405 Mass. 515, 520-521 (1989) (procedure by which employee is given notice of charges followed by pretermination hearing does not offend due process).

Nor do we conclude that Powers suffered unfair prejudice from the denial of the opportunity granted to him by the rules to be heard before formal charges were issued pursuant to Rule 7 (E) (4). See *Martorano* v. *Department of Pub. Utils.*, 401 Mass. 257, 262 (1987) ("There must be some showing of prejudice before an agency's disregard of its rules may constitute reversible error"). Powers has provided no proffer of what he or his attorney would have said to the committee had his request for an appearance been honored, and there is nothing in the record to suggest that any such statement would have affected the committee's decision to bring formal charges. Nor is this a case where the committee's disregard of its own procedures resulted

sachusetts and United States Constitutions identically." *Hoffer* v. *Board of Registration in Med.*, 461 Mass. 451, 454 n.5 (2012), quoting *Liability Investigative Fund Effort, Inc.* v. *Massachusetts Med. Professional Ins. Ass'n*, 418 Mass. 436, 443, cert. denied, 513 U.S. 1058 (1994).

in the respondent losing his only opportunity to resolve the allegations made against him before the commencement of formal proceedings. Contrast *Rivas* v. *Chelsea Hous. Auth.*, 464 Mass. 329, 337-338 (2013). Well before formal charges issued, Powers had numerous opportunities with the presiding justice of the Barnstable District Court, the Regional Administrative Justice, and the Chief Justice of the District Court Department to address the problems that later formed the bases of the formal charges. He squandered those opportunities; there is nothing in the record to suggest that he would have made better use of a committee appearance before formal charges were filed.

4. *Determining the appropriate sanction.* We now must focus on what we once characterized as our "unpleasant duty" to decide whether Powers's removal from office is the appropriate remedy under the circumstances. See *Massachusetts Bar Ass'n* v. *Cronin*, 351 Mass. 321, 325 (1966) (*Cronin*). Because clerk-magistrates play such a vital role in the functioning of the court, "judge[s] possess inherent authority to ensure that [clerk-magistrates] and assistant clerks perform their jobs faithfully and in a professional manner" and "possess the skills and competence to enable them to perform their duties in a professional manner and in conformity with governing statutes, rules, orders, and standards of accountability." *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't*, 438 Mass. 387, 399, 401 (2003). See *Opinion of the Justices*, 300 Mass. 596, 600 (1938) ("Officers who perform work in connection with the courts may be removed as an incident of the judicial function"). In addition to this inherent authority, the Legislature, by statute, has given this court the exclusive authority to remove clerks of court. G. L. c. 211, § 4. See *Turner* v. *Boston*, 462 Mass. 511, 521 (2012). Pursuant to G. L. c. 211, § 4, "[a] majority of the justices . . . if sufficient cause is shown therefor and it appears that the public good so requires, may, upon a complaint, upon a summary hearing or otherwise, remove a [clerk-magistrate] of . . . a district court." Alternatively, G. L. c. 211, § 4, authorizes this court to suspend clerk-magistrates on a lesser showing than sufficient cause to remove. See *Governor* v. *McGonigle*, 418 Mass. 558, 559-560 (1994); *McGonigle* v. *Governor*, 418 Mass. 147, 151 (1994).

"As enunciated by G. L. c. 211, § 4, and by our case law, the standard for removing a clerk-magistrate from office, where required by the 'public good,' is broad." *Bulger, supra* at 179. See *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 489 (1921) ("Words of general import and broad scope are used" in § 4). "A precise and detailed description of the acts which constitute ground for removal is not attempted in the statute." *Id*. We have noted that the "sole matter for inquiry is the public welfare" as it is affected by the "characteristics and conduct of the [respondent] in question." *Id*. at 490. In view of "our duty to keep the administration of justice above reproach," "[o]ur function is to ensure the integrity of the judicial system, which must not only be beyond suspicion but must appear to be so." *Cronin, supra* at 323, 326. "[I]t would be incongruous to hold out as [clerk-magistrate] one who has not conformed to the standards essential to every court." *Id*. at 326.[19]

In determining whether the removal of a clerk-magistrate is required by the public good, we look to the totality of the clerk-magistrate's conduct.

> "The grounds for the removal of the [clerk-magistrate] from office arise not from a single incident or even from a handful of incidents. They derive from a large number of events, representing varying degrees of improper conduct, which combine both to provide sufficient cause for the removal of the [clerk-magistrate] and to demonstrate to our satisfaction that the public good requires [his] removal."

*Matter of Dugan*, 416 Mass. 461, 464 (1993). See *Attorney Gen.* v. *Tufts, supra* (sufficient cause for removal is shown where respondent's behavior is "offensive to the right minded, so that public confidence in the purity and impartiality of his [or her] official work is justly shaken"). Because we focus on "the collective impact of [a clerk-magistrate's] transgressions,"

---

[19]As amended, G. L. c. 218, § 8, provides that clerks of the District Court and the Central Division of the Boston Municipal Court "shall hold office during good behavior." In *Massachusetts Bar Ass'n* v. *Cronin*, 351 Mass. 321, 323 (1966), we concluded that "[t]he introduction of the term 'good behavior' by the amendment should not be construed as limiting the ground of removal of district court clerks to misconduct in office and to narrowing to that extent the scope of G. L. c. 211, § 4," noting that doing so "would weaken judicial authority in the administration of justice."

"[w]e may not properly weigh each category of wrongful conduct in isolation, and thus we need not decide what discipline would be appropriate if each category of misconduct stood alone." *Matter of Dugan, supra* at 464-465.

Powers contends that he should not be removed from office because his conduct did not involve an act of moral turpitude and therefore was less egregious than conduct that has previously led to removal under § 4. He correctly points out that, apart from cases where we found mental impairment, we have previously exercised our authority under § 4 to remove clerk-magistrates or comparable public officials engaged in the administration of justice only where we found that they committed acts that involve some degree of moral turpitude. See, e.g., *Matter of Antonelli*, 429 Mass. 644, 645 (1999) (misuse of influence of office to promote personal interests); *Matter of Dugan, supra* at 465 (provision of favorable treatment to selected persons in disposition of civil motor vehicle infractions); *Cronin, supra* at 325 (providing false testimony); *Attorney Gen.* v. *Flynn*, 331 Mass. 413, 426 (1954) (making misleading statements to Attorney General); *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 305 (1922) (conspiracy to commit extortion); *Attorney Gen.* v. *Tufts, supra* at 494-538 (making false statements and conspiracy to commit extortion, among other crimes). Powers, however, does not point to any case where, after final hearing, we concluded that the misconduct merited a sanction less severe than removal under § 4. Therefore, "[t]he fact that some persons removed from public office engaged in more egregious conduct than did the [clerk-magistrate] does not help us answer the questions before us. We are left to assess the [clerk-magistrate's] wrongdoing to see whether there is sufficient cause for [the clerk-magistrate's] removal and whether the public good so requires." *Matter of Dugan, supra* at 464.

The findings by the hearing officer, as adopted by the committee, provide sufficient cause for Powers's removal, and we conclude, after considering the totality of the circumstances, that the public good requires his removal. We do not reach this conclusion lightly; we recognize that removal "strips the individual of the enjoyment of a position of distinction" to which he had been appointed by the Governor and approved by

the Governor's Council. See *Attorney Gen.* v. *Tufts, supra* at 490. Our reasons for reaching this conclusion are best summarized by a statement made by Judge O'Neill, the presiding justice of the court where Powers presided as clerk-magistrate, during his testimony at the hearing: "I just want the clerk to do his job." The record demonstrates that from the date he started work at the Barnstable District Court through the time of the hearing, Powers fundamentally failed to do his job. He was not there during the busiest time of day for the clerk's office, leaving the office without necessary leadership and an essential helping hand, apparently failing to recognize that one essential component of his job was to show up when the work needed to be done. He continually abused his authority as clerk-magistrate by his mistreatment of litigants, court personnel, and even the presiding justice of the court. He failed to render timely decisions and sought to cover up his failure by asking employees under his direction to change the date of decision to the date of hearing. He failed to meet his obligation to ensure that monies collected by the clerk's office were deposited daily in a local bank, and effectively denied litigants the opportunity timely to appeal his denial of the issuance of a criminal complaint at a show cause hearing by directing his staff not to send notice of his denial. We need not consider whether any of these findings involves some degree of moral turpitude because we do not accept Powers's suggestion that he can keep his job, despite failing effectively to perform it for more than four years, as long as he avoids acts of moral turpitude.

In deciding that the public good requires Powers's removal, we consider that Powers was given numerous opportunities to remediate his conduct, yet failed to make any effort to reform his behavior until he had been suspended by Chief Justice Connolly and learned that a special counsel had been appointed to investigate his conduct as clerk-magistrate. In fact, he expressly demonstrated an unwillingness to evaluate his own conduct even when asked to do so by the presiding justice of his court, the Regional Administrative Justice, and the Chief Justice of the District Court Department. When the presiding justice told him that, with only one assistant clerk in the office, he had to get to work on time and "roll up [his] sleeves," he loudly

responded that the judge had no right to tell him how to run the clerk's office. As recently as his deposition in this disciplinary proceeding, he asserted that it was "debatable" whether he had to be at work at 8:30 A.M. He characterized the complaining litigants as "crazy" and incorrectly belittled complaints as "sour grapes" from those who lost cases over which he presided. During his testimony, he appeared unaware of the adverse effect his behavior had on attorneys and litigants. Making matters worse, his mistreatment of the clerk's office staff has created an environment where they are embarrassed by him and uncomfortable with his presence, rendering it difficult for the office to run effectively if he were to return as clerk-magistrate. Even though his behavior improved after he was assigned to other courts during the pendency of this matter and placed under the supervision of the clerk-magistrates in those courts, and even though he now arrives at work on time, it is too late for him reasonably to repair his reputation among the staff, attorneys, and litigants at the Barnstable District Court.

*Conclusion.* After consideration of the record presented by the committee and after hearing, we conclude that sufficient cause is shown for the removal of Powers from the office of clerk-magistrate of the Barnstable District Court and that the public good requires his removal, and we therefore order that he be, and hereby is, removed from that office.

*So ordered.*