# Patricia Campatelli *vs.* Chief Justice of the Trial Court & others.[1]

Suffolk. May 8, 2014. - June 20, 2014.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Supreme Judicial Court,* Superintendence of inferior courts. *Register of Probate. Chief Justice of the Probate and Family Court Department. Chief Justice of the Trial Court. Court Administrator. Statute,* Construction. *Practice, Civil,* Waiver.

This court concluded, based on its statutory authority of general superintendence of the administration of all courts of inferior jurisdiction, and its inherent common-law and constitutional powers to supervise the administration of justice, that although a civil complaint filed in the county court by the Register of Probate and Insolvency for Suffolk County pursuant to G. L. c. 231A, against the Chief Justice of the Probate and Family Court Department, the Chief Justice of the Trial Court, and the Court Administrator, challenging their suspension of her with pay, was subject to dismissal (at least with respect to the chief justices), in that there is no right to bring a declaratory judgment action against the judicial department, it was appropriate to consider her complaint as a petition brought under G. L. c. 211, § 3, and to decide the case on its merits, where the case raised important issues concerning the proper administration of the judicial branch. [459-460]

This court concluded that G. L. c. 211, § 4, which vests exclusive authority in a majority of the Justices of this court to remove a public official named in that statute (including a register of probate), does not restrict to the Justices of this court the authority to suspend a register of probate with pay. [460-462]

This court concluded that the Court Administrator acted within his authority under G. L. c. 211B, § 9A (xii), when he suspended with pay the Register of Probate and Insolvency for Suffolk County (register), where the Legislature intended the statute to vest in the Court Administrator the same statutory authority that it had given to the former position of Chief Justice for Administration and Management of the Trial Court to impose discipline on nonjudicial officers and employees of the Trial Court, including suspension, when necessary to ensure the proper administration of justice [462-470]; further, this court concluded that the decision to suspend the register with pay fell well within the inherent judicial authority of both the Chief Justice of the Trial Court and the Chief Justice of the Probate and

---

[1]The Court Administrator and the Chief Justice of the Probate and Family Court Department of the Trial Court.

Family Court Department to control and supervise personnel within the judicial system, and that this authority is also incorporated into the statutory powers enumerated in G. L. c. 211B, §§ 9 (xxiii) and 10 (vi), respectively [470-477].

This court declined to consider a claim that it deemed waived. [477]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 14, 2014.

The case was reported by *Duffly*, J.

*Philip R. Boncore* (*Jeffrey Rosario Turco* with him) for the plaintiff.

*Peter Haley* for Association of Magistrates and Assistant Clerks of the Trial Court of the Commonwealth of Massachusetts, amicus curiae.

*Daniel P. Sullivan*, Special Assistant Attorney General, for the defendants.

BOTSFORD, J. The Register of Probate and Insolvency for Suffolk County, Patricia Campatelli, was placed on paid administrative leave — suspended with pay — by the Chief Justice of the Probate and Family Court Department, the Chief Justice of the Trial Court, and the Court Administrator, pending further investigation of allegations of inappropriate conduct and mismanagement in the performance of her duties. Campatelli commenced this action in the county court to challenge her suspension by the three named court officials; her claim is that only the Justices of this court possess the authority to suspend her, pursuant to G. L. c. 211, § 4. We do not interpret c. 211, § 4, to vest sole authority in this court or its Justices to suspend with pay a register of probate, and conclude that the Chief Justice of the Trial Court, the Court Administrator, and the Chief Justice of the Probate and Family Court Department possess the authority to do so pursuant to G. L. c. 211B, §§ 9, 9A, and 10, respectively.

*Background.* Campatelli disputes the allegations and findings contained in the record regarding her conduct in office, but the facts relating to the legal issues before us are undisputed. In November, 2012, Campatelli was elected as the Register of Probate and Insolvency for Suffolk County (register of probate, or register); she took office on January 3, 2013. See G. L. c. 217, § 4. As register, Campatelli served in the Suffolk County Divi-

sion of the Probate and Family Court Department of the Trial Court. On December 22, 2013, the Chief Justice of the Probate and Family Court Department, Angela M. Ordoñez (Chief Justice Ordoñez), citing G. L. c. 211B, § 10 (vi), as authority, suspended Campatelli with pay pending further investigation of an allegation that Campatelli had physically assaulted a court employee after an office holiday party on December 18, 2013. The investigation, conducted by an attorney in the human resources department of the Trial Court, concluded that the allegation against Campatelli was unsupported, and Chief Justice Ordoñez terminated the suspension on December 30.

On January 15, 2014, Chief Justice Ordoñez, citing the same statutory authority, again suspended Campatelli with pay. As set forth in the Chief Justice's letter to Campatelli, this suspension was based on new allegations of Campatelli's (1) "failure to properly manage the office [of the registry of probate]"; (2) "unprofessional conduct and behaviors in the office and toward employees"; and (3) causing "turmoil and disruption" connected to both of the above.[2] On January 17, 2014, the Chief Justice of the Trial Court, Paula M. Carey (Chief Justice Carey), and the Court Administrator, Harry Spence (Court Administrator Spence, or Court Administrator) citing their statutory authority under G. L. c. 211B, §§ 9 and 9A, respectively, appointed an investigator "to conduct a thorough inquiry and to report [his] findings, conclusions and recommendations, concerning the following [specified matters] in the management and administration of the Registrar's [*sic*] Office at the Suffolk Probate and Family Court." During his investigation, the investigator interviewed thirty-nine individuals, including registry staff, judicial staff, administrators, and an attorney with experience working in the registry; he also met with Campatelli twice. On March 3, 2014, he issued his report on the investigation, and Campatelli received a copy that same day. Relying on information obtained through interviews, documents, and transcripts,

---

[2]Thereafter, on January 24, 2014, acknowledging Patricia Campatelli's concerns over the negative connotations of the word "suspension," the Trial Court agreed to refer to Campatelli's status as "paid administrative leave." We see no legally cognizable difference between suspension with pay and paid administrative leave, and use the terms interchangeably in this opinion.

the investigator made findings[3] regarding Campatelli's management of the register's office and concluded that "there are serious deficiencies in the conduct of [Campatelli] both as to her responsibilities and duties as [r]egister, in the way she interacts with a number of staff, and in the general climate she has created in the office with respect to staff that fall into her disfavor." Two days later, on March 5, Chief Justice Carey, Chief Justice Ordoñez, and Court Administrator Spence notified Campatelli by letter that, based on the conclusions of the investigator's report, they were "referring this matter to the Committee on Professional Responsibility for Clerks of the Courts" (committee).[4] The letter directed Campatelli, while proceedings before the committee were pending, to remain on paid administrative leave and to refrain from any contact with the Suffolk County Division of the Probate and Family Court Department or its employees. Thereafter, Campatelli filed a complaint in the county court, seeking a judgment declaring that the three court officials were without authority to suspend her, and a preliminary injunction permitting her immediately to resume her duties as elected

---

[3]The investigator's findings fall into four categories: (1) adherence to work hours and duties; (2) office decorum and gender/sexual harassment; (3) favoritism/intimidation and fear of retaliation; and (4) the events of December 18, 2013 (when Campatelli allegedly assaulted a court employee). The investigator found objectionable conduct by Campatelli in each category, some of which, he concluded, violated the Code of Professional Responsibility for Clerks of Court, S.J.C. Rule 3:12, or the Massachusetts Trial Court Policy and Procedure for the Elimination of Sexual and Gender Harassment in the Workplace. Regarding the events of December 18, 2013, the investigator agreed that the charges against Campatelli were unsubstantiated, but also concluded that Campatelli "exercised poor judgment" on that evening.

[4]The referral was made pursuant to S.J.C. Rule 3:13, as appearing in 407 Mass. 1308 (1990), which provides in part:

"The Supreme Judicial Court may establish a committee on professional responsibility to investigate any action of a Clerk-Magistrate, as defined in rule 3:12 [to include the register of probate], including (a) conviction of a crime, (b) wilful misconduct in office, (c) wilful misconduct which, although not related to duties as a Clerk-Magistrate, brings the office of Clerk-Magistrate into disrepute, (d) conduct prejudicial to the administration of justice or conduct unbecoming a Clerk-Magistrate, whether conduct in office or outside of duties as a Clerk-Magistrate, that brings the office of Clerk-Magistrate into disrepute, or (e) any conduct that constitutes a violation of rule 3:12."

register.[5] The single justice reserved and reported the case to the full court.[6]

*Discussion.* 1. *Preliminary issues.* Campatelli brings her complaint pursuant to G. L. c. 231A, and seeks declaratory and injunctive relief. There is no right to bring a declaratory judgment action against the judicial department. See G. L. c. 231A, § 2 (procedure for obtaining declaratory relief under c. 231A "shall not apply to the governor and council or the legislative and judicial departments"). Accordingly, at least with respect to Chief Justices Carey and Ordoñez, Campatelli's complaint is subject to dismissal. See *Fathers & Families, Inc.* v. *Chief Justice for Admin. & Mgt. of the Trial Court,* 460 Mass. 508, 509 (2011) (affirming dismissal of complaint against Chief Justice for Administration and Management of the Trial Court because "the declaratory judgment statute, G. L. c. 231A, prohibits any action for declaratory relief against the judicial department"). Court Administrator Spence, of course, is not a judge and does not exercise judicial authority, although as the Court Administrator, he is part of the "judicial department." Nevertheless, we do not need to resolve whether declaratory relief under c. 231A is available with respect to him,[7] because Campatelli, apparently acknowledging that (at least as to some of the court officials) she may not pursue such relief, requests this court to consider her complaint as a petition for relief brought under G. L. c. 211, § 3.

The case raises important issues concerning the proper administration of the judicial branch. Given this court's statutory authority of "general superintendence of the administration of all courts of inferior jurisdiction," G. L. c. 211, § 3, and our

---

[5]Campatelli's complaint also included claims that all three court officials violated her right to due process, protected under arts. 5 and 12 of the Massachusetts Declaration of Rights. Because she has not presented any argument in her brief concerning those claims, we treat them as waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

[6]We acknowledge the amicus brief submitted in support of Campatelli by the Association of Magistrates and Assistant Clerks of the Trial Court of the Commonwealth of Massachusetts.

[7]Cf. *Sullivan* v. *Chief Justice for Admin. & Mgt. of the Trial Court,* 448 Mass. 15, 27 (2006) (property management duties assigned to Chief Justice for Administration and Management, as opposed to duties of judicial administration, may be subject of action for declaratory relief under G. L. c. 231A).

"inherent common law and constitutional powers to supervise
the administration of justice," *Foley* v. *Lowell Div. of the Dist.
Court Dep't*, 398 Mass. 800, 804 (1986), it is appropriate, as
Campatelli requests, to consider her complaint as a petition
brought under G. L. c. 211, § 3, and to decide the case on its
merits. See *First Justice of the Bristol Div. of the Juvenile
Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juve-
nile Court Dep't*, 438 Mass. 387, 391 (2003) (*First Justice*)
(court determined it appropriate to decide case pursuant to G. L.
c. 211, § 3, where it "concerns an internal dispute between
members of the judicial department, . . . raises important issues
with implications for the effective administration of justice,
. . . and states an important matter of public interest that may
cause further uncertainty within the courts" [citations omitted]).

*2. Authority to suspend with pay.* The essence of Campatelli's
argument is that the three court officials cannot suspend her (or
place her on administrative leave) with or without pay, because
the Legislature has vested the authority to take such action
solely in this court under G. L. c. 211, § 4. More specifically,
she argues that the office of register of probate is one that exists
as a result of legislative action, see *Opinion of the Justices*, 117
Mass. 603, 603-604 (1875); St. 1856, c. 173, § 1, and because
of this fact, neither the office of register nor Campatelli as its
occupant is subject to regulation by any exercise of inherent
judicial authority. Rather, only the Legislature can prescribe
whether and how suspension and removal may take place, and
the Legislature has done so by enacting c. 211, § 4, which
places authority over both exclusively with this court. Accord-
ingly, the argument goes, because this court has not taken any
action under c. 211, § 4, to suspend Campatelli or even to ratify
the suspension ordered by the respondents, her suspension must
be terminated and she must be reinstated immediately to her
position as register.

We disagree with Campatelli on two separate grounds. First,
as we shall explain, G. L. c. 211, § 4, does not provide the sole
legislative authority to suspend with pay a register of probate,
and each of the three court officials possesses statutory author-
ity to do so under different provisions of G. L. c. 211B. See
G. L. c. 211B, §§ 9, 9A, and 10. Second, consistent with these

statutory provisions, the inherent judicial authority possessed by Chief Justices Carey and Ordoñez includes the authority to suspend a register of probate with pay when necessary for the proper administration of justice.[8]

a. *Statutory authority.* i. *G. L. c. 211, § 4.*[9] It is important to note at the outset of this discussion of G. L. c. 211, § 4, that the precise issue before us in this case is the authority of the three court officials to suspend with pay — or place on paid administrative leave — a register of probate pending an investigation into allegations of professional misconduct and proceedings before the committee. General Laws c. 211, § 4, expressly vests the authority in a majority of the Justices of this court to remove, among other officials listed in the section, a register of probate from her position.[10] See *Matter of Powers*, 465 Mass. 63, 82 (2013) ("the Legislature, by statute [G. L. c. 211, § 4], has given this court the exclusive authority to remove clerks of court"). Nonetheless, we have interpreted this statute to include

---

[8]Neither ground for our conclusion turns on the fact that the register of probate is an elected rather than an appointed officer. See G. L. c. 217, § 4. Each of the statutory provisions principally at issue in this case, G. L. c. 211B, §§ 9, 9A, and 10, on its face makes no distinction between elected and appointed officers, and we find no evidence of legislative intent that these statutes nonetheless be interpreted to draw one. Further, there is nothing within the concept of inherent judicial authority that supports such a distinction. Accordingly, to the extent that Campatelli argues that her status as an elected officer has a bearing on the resolution of the legal issues presented, we disagree.

[9]General Laws c. 211, § 4, provides:

"A majority of the justices may, if in their judgment the public good so requires, remove from office a clerk of the courts or of their own court; and if sufficient cause is shown therefor and it appears that the public good so requires, may, upon a complaint, upon a summary hearing or otherwise, *remove* a clerk of the superior court in Suffolk county, or of a district court, a county commissioner, a county treasurer, sheriff, register of probate or district attorney, or the recorder of the land court" (emphasis added).

[10]The removal of the register is not at issue here, and we continue to interpret G. L. c. 211, § 4, as vesting the power to remove the officials named in that statute, including a register of probate, solely and exclusively in the Justices of this court. See *Matter of Powers*, 465 Mass. 63, 82 (2013).

Additionally, we have no occasion in this case to decide whether any or all of the three court officials have the authority to suspend a register of probate without pay.

the power to suspend. See *McGonigle* v. *The Governor*, 418 Mass. 147, 151 (1994) ("Although [c. 211, § 4,] does not specifically enumerate the authority to suspend . . . , it is clear that the power to remove an official includes within it the authority to suspend that individual"). Campatelli contends that *McGonigle* stands for the proposition that, as with the power to remove, c. 211, § 4, also vests exclusive authority in a majority of the Justices of this court to suspend a public official named in that statute, including a register. Therefore, she argues, the three court officials unlawfully encroached on this court's authority by placing Campatelli on paid administrative leave.

Campatelli's reading of G. L. c. 211, § 4, is not correct. That this court's exclusive power of removal under the statute includes the power to suspend does not, by itself, mean that the Legislature intended the court also to have the exclusive power to suspend. In other words, although the lesser power to suspend is an intrinsic incident of the greater power to remove, see *McGonigle*, 418 Mass. at 151; *Tobin* v. *Sheriff of Suffolk County*, 377 Mass. 212, 214 (1979) (considering G. L. c. 221, § 72), that fact says nothing about what the Legislature intended, in enacting § 4, with respect to who may exercise the power of suspension — especially where, as *McGonigle*, *supra*, states, § 4, by its terms, does not mention suspension or the power to suspend. In arguing otherwise, Campatelli makes an analytical leap that is unsupported by the language of c. 211, § 4, and logic. Because § 4 does not restrict the authority to suspend a register of probate with pay to the Justices of this court, we consider the statutes on which the three court officials rely for their authority to do so.

ii. *G. L. c. 211B.* Originally enacted in 1978 as part of a significant effort to improve the administrative capacity and operations of the courts, G. L. c. 211B, among other things, creates an administrative organization of the Trial Court and delineates administrative powers and duties of chief justices and certain nonjudicial officers and employees within it. See St. 1978, c. 478, § 110. The three court officials contend that various provisions of c. 211B, most recently amended in 2011, see St. 2011, c. 93, authorize them to suspend Campatelli with pay: Chief Justice Carey locates her authority in c. 211B, § 9 (xxiii)

(§ 9 [xxiii]); Court Administrator Spence locates his in c. 211B, § 9A (xii) (§ 9A [xii]); and Chief Justice Ordoñez in c. 211B, § 10 (vi) (§ 10 [vi]). We consider the scope of each court official's authority under the cited statutory provisions, beginning with Court Administrator Spence.

A. *Court Administrator Spence, G. L. c. 211B, § 9A (xii).* As "the administrative head of the trial court," Court Administrator Spence is "responsible for the management of court personnel, facilities, administration, security, and court business and shall . . . have the authority necessary to carry out these responsibilities." G. L. c. 211B, § 9A, second & third pars., as amended by St. 2011, c. 93, § 52. To that end, § 9A vests significant administrative authority in him. See G. L. c. 211B, § 9A, first par. (Court Administrator has "general superintendence of the administration of the trial court, including, without limitation, the improvement of the administration of such courts and the securing of their proper and efficient administration"). Among the Court Administrator's specific enumerated powers are those found in § 9A (xii), which grants him the power to impose discipline, including suspension with pay, on employees and officers of the Trial Court; includes two provisos allowing him to transfer nonjudicial personnel; and includes in a separate sentence a third and final proviso (final proviso) stating that "this provision shall not apply to a . . . register of probate."[11]

The parties disagree over the meaning of this final proviso.

---

[11]General Laws c. 211B, § 9A (xii) (§ 9A [xii]), as amended by St. 2011, c. 93, § 52, provides:

"[N]otwithstanding any general or special law to the contrary, when necessary to ensure the proper administration of justice, [the court administrator shall have the authority to] transfer employees of the trial court to serve where needed; *impose discipline on such officers and employees, including dismissal and suspension with or without pay; provided, however, that the court administrator may,* upon reasonable notice, *temporarily transfer nonjudicial personnel* among the various departments, divisions and places for holding court, and in no event shall any such transfer be more than a reasonable distance from the place where such personnel is employed unless the employee so transferred shall consent thereto; *provided, further, that such transfer of the employee shall not be for more than [ninety] days,* but such transfer may be extended for [three] consecutive [ninety-]day periods, provided that notice is given to the house and senate committees on ways and means upon each extension, including the employee's position, duties,

Pointing to the fact that § 9A (xii) deals first with discipline of Trial Court nonjudicial employees and, thereafter, separately, with transfer of such personnel, the three court officials argue that the final proviso's placement at the end of the second sentence in the subsection makes clear that this proviso is concerned solely with a "provision" in that second sentence addressing permanent transfers, and not with the earlier discipline provisions. In their view, because the final proviso is in the second sentence of § 9A (xii), and "bears no grammatical relation" to the subsection's first sentence — which contains the grant of authority to "impose discipline," including suspension with pay — the proviso does not restrict the Court Administrator's authority to suspend with pay a register of probate. Campatelli argues that the final proviso applies to the whole of § 9A (xii), and therefore bars the Court Administrator from both transferring and disciplining a register of probate such as herself.

"Our primary duty in interpreting a statute is 'to effectuate the intent of the Legislature in enacting it.' " *Water Dep't of Fairhaven* v. *Department of Envtl. Protection*, 455 Mass. 740, 744 (2010), quoting *International Org. of Masters* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 392 Mass. 811, 813 (1984). When the meaning of statutory language is plain and unambiguous, our obligation is to interpret the statute according to its words. See *Thurdin* v. *SEI Boston, LLC*, 452 Mass. 436, 444 (2008) ("Ordinarily, where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent"). The meaning of the final proviso in § 9A (xii), however, is distinctly not plain and unambiguous; as the differing interpretations advanced by the parties reflect, the subsection on its face does not make clear whether the Legislature intended the final proviso to apply only to § 9A (xii)'s provisions regarding transfer, or to the entire subsection. Accord-

and reason for the transfer, but such transfer shall not exceed 360 consecutive days. *The first justice of the court to where the employee is transferred shall provide the first justice of the court to where the employee is permanently assigned with appropriate personnel records and records of activities, including records necessary for the payment of compensation; and provided, however, that this provision shall not apply to a clerk or clerk-magistrate, whether elected or appointed by the governor, register of probate or recorder.*" (Emphasis added.)

ingly, "we consider 'the cause of [the statute's] enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.' " *Water Dep't of Fairhaven, supra* at 744, quoting *DiFiore* v. *American Airlines, Inc.,* 454 Mass. 486, 490 (2009). To that end, we look to its legislative history. See *Sullivan* v. *Chief Justice for Admin. & Mgt. of Trial Court,* 448 Mass. 15, 24 (2006), quoting *Murphy* v. *Bohn,* 377 Mass. 544, 548 (1979) ("Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with their development, their progression through the legislative body, the history of the times, [and] prior legislation").[12]

The current version of G. L. c. 211B, § 9A (xii), was enacted in 2011. See St. 2011, c. 93, § 52. The 2011 legislation essentially restructured the system of administration and management of the Trial Court, and in the process reorganized many of the provisions of G. L. c. 211B. See St. 2011, c. 93, §§ 49-61. According to the legislative leaders, this initiative was part of a comprehensive court reform effort "focused on providing the Commonwealth with the most efficient and cost-effective infrastructure for the disposition of justice." Court Reorg, Hiring Reform Compromise Teed Up for Friday Session, State House News Service (July 28, 2011) (quoting joint statement of Speaker of House of Representatives Robert DeLeo and Senate President Therese Murray). A key component of these changes was the elimination of the position of the Chief Justice for Administration and Management of the Trial Court (CJAM) that had concentrated all the judicial, administrative, and managerial powers and duties in one person, and the replacement of that single position with two new positions of Chief Justice of the Trial Court (CJTC) and Court Administrator.[13] See G. L. c. 211B, §§ 1, 6, as amended by St. 2011, c. 93, §§ 49, 52. In creating

---

[12]See also *Thurdin* v. *SEI Boston, LLC,* 452 Mass. 436, 449 (2008) (occasionally court looks "at the history and purpose of unambiguous statutes to determine legislative intent").

[13]As envisioned by the Legislature, this new administrative structure would capitalize on the respective areas of expertise of the Chief Justice of the Trial Court (CJTC) and the Court Administrator to create a better functioning and more cost-effective trial court system: the CJTC would be responsible for judicial functions and could focus on adjudicatory matters, while the civilian

these two new positions, the Legislature divided the exact set of powers and duties that the CJAM alone had held between the new CJTC and Court Administrator. Through this process, the statutory authority formerly vested in the CJAM to discipline and transfer officers and employees of the Trial Court under G. L. c. 211B, § 9 (xxii), as inserted by St. 1992, c. 379, § 77 (former § 9 [xxii]),[14] was transferred essentially word for word to the Court Administrator and set out as the new G. L. c. 211B, § 9A (xii) (quoted in note 11, *supra*). Accordingly, because the ambiguous final proviso within the current § 9A (xii) originated

Court Administrator would assume responsibility for all nonjudicial functions to streamline the bureaucracy of the judiciary and "improve[] service and . . . the administration of [the] trial court." State House News Service (House Sess.), May 11, 2011 (statement of Rep. O'Flaherty). See Court Reorg, Hiring Reform Compromise Teed Up for Friday Session, State House News Service (July 28, 2011) (describing functions of CJTC and Court Administrator).

[14]General Laws c. 211B, § 9 (xxii), as inserted by St. 1992, c. 379, § 77 (former § 9 [xxii]), authorized the CJAM,

> "notwithstanding any general or special law to the contrary, when necessary to ensure the proper administration of justice, [to] transfer employees of the trial court to serve where needed; impose discipline on such officers and employees, including dismissal and suspension with or without pay; provided, however, that the chief justice for administration and management may, upon reasonable notice, temporarily transfer nonjudicial personnel among the various departments, divisions and places for holding court, and in no event shall any such transfer be more than a reasonable distance from the place where such personnel is employed unless the employee so transferred shall consent thereto; provided, further, that such transfer of the employee shall not be for more than ninety days, but such transfer may be extended for three consecutive ninety-day periods, provided that notice is given to the house and senate committees on ways and means upon each extension, including the employee's position, duties, and reason for the transfer, but such transfer shall not exceed [360] consecutive days. The first justice of the court to where the employee is transferred shall provide the first justice of the court to where the employee is permanently assigned with appropriate personnel records and records of activities, including records necessary for the payment of compensation; and provided, however, that this provision shall not apply to a clerk or clerk-magistrate, whether elected or appointed by the governor, register of probate or recorder."

A comparison of this language with the text of the current G. L. c. 211B, § 9A (xii), quoted at note 11, *supra*, makes plain that other than the references to the Court Administrator instead of the CJAM, the two statutory provisions are identical.

in the former § 9 (xxii), we look to the legislative history of former § 9 (xxii) to help understand and resolve the ambiguity.

The former § 9 (xxii) was enacted as part of an earlier court reform effort undertaken by the Legislature in 1992. One, if not *the* central, feature of the 1992 legislation was the replacement of the position of Chief Administrative Justice of the Trial Court — a position created in court reform legislation passed in 1978, see St. 1978, c. 478, § 110 — with the CJAM position to emphasize the position's management role. See St. 1992, c. 379, §§ 69, 73, 77.[15] The legislative history of St. 1992, c. 379, shows that the Legislature intended the CJAM to possess the authority both to discipline and transfer nonjudicial officers and employees of the Trial Court, and that the disciplinary authority expressly included the ability to impose suspension. This is evident from language in early versions of the bill that ultimately became c. 379, language that remained essentially unchanged as it moved through the House of Representatives and the Senate in late 1992. See 1992 House Doc. No. 5944, § 106 (authorizing CJAM to "impose discipline on such officers and employees [of the Trial Court], including dismissal and suspension with or without pay." [emphasis added]).[16] See also 1992 House Doc. No. 6232, § 102 (adopting same); 1992 House Doc. No. 6210, § 98 (adopting same). Significantly, in each of the bills, the topics of discipline and transfer were dealt with in separate clauses and subclauses, and the only limitation regarding the

---

[15]At this time, there was widespread concern, both outside and inside the judiciary, about the management of the Trial Court, and in particular, the system's accountability and capacity to manage the Trial Court's work efficiently. See Connolly & McDermott, Court Reform: A Retrospective, 39 Boston B.J. 4, 4, 6 (Mar.-Apr. 1995). See also Harvey, The Inherent Power to Reform: An Essay on the Massachusetts Judiciary, 77 Mass. L. Rev. 8, 8-9 (1992). The Justices of this court themselves caused to be filed in the Senate a bill proposing a series of judicial system management reforms. See 1991 Senate Doc. No. 783, entitled "An Act to Improve the Administration of Justice in the Commonwealth," signed individually and submitted by the seven Justices.

[16]1992 House Doc. No. 5944, reported by the Committee on the Judiciary on July 7, 1992, represented a new draft of nineteen bills concerned with reform of Trial Court management and the administration of justice, including 1991 Senate Doc. No. 783, the bill submitted earlier by the Justices. (See note 15, *supra*.)

CJAM's authority over the register of probate appeared within a separate subclause addressing transfer, not discipline.[17]

After 1992 House Doc. No. 6232 passed the House of Representatives and moved to the Senate on November 18, 1992, it was succeeded by additional versions, in which the language of the proposed § 9 (xxii) changed. See 1992 Senate Doc. No. 1783, § 68; 1992 Senate Doc. No. 1788, § 68. In these Senate versions of the legislation, the final proviso that is the source of the ambiguity we find in the current § 9A (xii) first appeared. But it is clear from the text and sentence structure of these Senate bills that (1) the changes that the Senate made to the proposed legislation it had received from the House all concerned the CJAM's authority to transfer nonjudicial personnel in the Trial Court, and not the authority to discipline; and (2) the final proviso, with its exception for elected and appointed clerks, clerk-magistrates, registers, and recorders, was intended to apply only to the provisions dealing with transfers of personnel — and, it appears, only permanent transfers at that — not with the entire subsection.[18]

---

[17]An example helps illustrate these points. 1992 House Doc. No. 6232, § 102, containing language that was largely unchanged from prior bills, passed the House of Representatives and was sent to the Senate for concurrence on November 18, 1992. It provided, in relevant part, that the CJAM

"shall be responsible for the management of court personnel, facilities, administration, security, and court business and shall have the authority to carry out these responsibilities including, but not limited to, the following:

". . .

"(xxii) when necessary to ensure the proper administration of justice, assign officers and employees of the trial court to serve where needed; *impose discipline on such officers and employees*, including dismissal and suspension with or without pay, subject to applicable collective bargaining agreements;

"(*a*) the [CJAM] may assign nonjudicial personnel among the various departments, divisions and places for holding court, and in no event shall any such transfer be more than a reasonable distance from the place where such personnel is employed. *This section shall not apply to a clerk, clerk-magistrate, whether elected or appointed by the governor, register of probate or recorder*" (emphasis added).

[18]1992 Senate Doc. No. 1783, § 68, which was substituted in the Senate

Following the Senate's vote on December 23, 1992, a conference committee was appointed, and on January 5, 1993, that committee reported out a new bill that was passed by both branches of the Legislature and signed by the Governor on January 13, 1993, as St. 1992, c. 379. Former § 9 (xxii) was enacted as part of this legislation, see St. 1992, c. 379, § 77.[19]

for 1992 House Doc. No. 6232 after the latter was passed in the House of Representatives and sent to the Senate (see note 17, *supra*), provides that the CJAM shall have the authority

> "(xx) notwithstanding any general or special law to the contrary, when necessary to ensure the proper administration of justice, [to] assign or transfer officers and employees of the trial court to serve where needed; *impose discipline on such officers and employees, including dismissal and suspension with or without pay,* subject to applicable collective bargaining agreements; *provided, however, that the [CJAM] may, upon reasonable notice, temporarily or permanently assign or transfer nonjudicial personnel* among the various departments, divisions and places for holding court, and in no event shall any such assignment or transfer be more than a reasonable distance from the place where such personnel is employed unless the employee so assigned or transferred shall consent thereto; *provided, further,* that the [CJAM] and management shall promulgate guidelines to distinguish temporary assignments or transfers from permanent assignments or transfers; *provided, further, that in the event of a permanent assignment or transfer, such nonjudicial employees shall have all appropriate personnel records and activities, including the payment of compensation, if appropriate, transferred to the newly assigned department, division, or court, as the case may be; and provided, however, that this provision shall not apply to a clerk, clerk-magistrate, whether elected or appointed by the governor, register of probate, or recorder"* (emphasis added).

The next iteration, 1992 Senate Doc. No. 1788, § 68, was passed by the Senate on December 23, 1992. It was almost identical to 1992 Senate Doc. No. 1783, except that, near the end of the subsection's provisos concerned with transfers of nonjudicial personnel or employees, the Senate added a new, penultimate proviso stating that any nonjudicial employee assigned or transferred for more than ninety days "shall be deemed to be transferred permanently and notice thereof shall be sent by the [CJAM] to the house and senate committees on ways and means." This proviso was then followed immediately with the identical final proviso appearing in 1992 Senate Doc. No. 1783, namely, "and provided, however, that this provision shall not apply to a clerk, clerk-magistrate, whether elected or appointed by the governor, register of probate, or recorder." These Senate bills indicate in a reasonably clear way that the final proviso was intended to apply to protect elected and appointed clerks and registers from at least permanent transfers by the CJAM.

[19]Pertinent to this case, the enacted subsection differs from the final Senate version discussed in note 18, *supra*, in that the Senate's provisions distinguish-

The language of former § 9 (xxii), as enacted by St. 1992, c. 379, § 77, is by no means a model of clarity. Considered in light of the history of its passage through the Legislature, however, we are persuaded that the final proviso in it was intended by the Legislature to ensure that the CJAM would not be authorized to transfer — at least on a permanent basis — any elected or appointed clerk, register of probate, or recorder. This proviso does not apply in any manner to the unambiguous directive in the first part of the first sentence of § 9 (xxii), stating that "when necessary to ensure the proper administration of justice," the CJAM was authorized to "impose discipline" on nonjudicial "officers and employees" of the Trial Court, including suspension.

We return to this case. Because the Legislature transferred to the Court Administrator in substantially identical form the authority to impose discipline vested in the CJAM by the former § 9 (xxii), and informed by the legislative history of that earlier subsection, we conclude that the Legislature intended § 9A (xii) to vest in the Court Administrator the same statutory authority to discipline officers and employees of the Trial Court that it had given to the CJAM in 1992. Accordingly, Court Administrator Spence acted within his authority under § 9A (xii) when he placed Campatelli on paid administrative leave on March 5, 2014.

B. *Chief Justice Carey, G. L. c. 211B, § 9 (xxiii)*. As the CJTC, Chief Justice Carey is "the policy and judicial head of the trial court of the commonwealth," and has "general superintendence of [its] judicial policy . . . including, without limitation, the improvement of the administration of such courts." G. L. c. 211B, § 9, first and second pars., as amended by St. 2011, c. 93, § 52. Her statutory powers to carry out these functions are further enumerated in the twenty-three subsections of c. 211B, § 9.

We have reviewed previously the 2011 amendment to G. L.

---

ing between temporary and permanent transfers of nonjudicial personnel have been removed; for the first time, a second sentence has been added to the subsection — that second sentence contains the only mention of permanent transfers, and the proviso excepting clerks and registers appears at the end of the sentence.

c. 211B that eliminated the position of CJAM, created an administrative and management structure for the Trial Court led jointly by the new CJTC and Court Administrator, and reallocated many of the CJAM's former powers to the Court Administrator including the authority to discipline and, in particular, to suspend employees and officers of the Trial Court. Focusing on the 2011 amendments of c. 211B, §§ 9 and 9A, Campatelli contends that there is no statutory power currently listed or described in the current version of § 9 that purports to authorize Chief Justice Carey to suspend a register of probate, or that even touches on this topic. Campatelli is correct, insofar as a direct legislative statement of authority goes. But Chief Justice Carey argues, and we agree, that in § 9 (xxiii), the Legislature has expressly recognized her inherent judicial power, and that inherent power includes the authority to discipline and, in particular, to suspend with pay an officer or employee of the Trial Court.

General Laws c. 211B, § 9, provides:

> "The chief justice of the trial court . . . shall have the authority necessary to carry out [her] responsibilities including, but not limited to, the following:—

> ". . .

> "the authority to exercise any inherently judicial power not otherwise specified in this section; provided, however, that nothing in this section shall authorize the chief justice to exercise any power reserved to the full court."

As we discuss hereafter, the CJTC possesses the inherent judicial authority to "control and supervise personnel within the judicial system." *First Justice*, 438 Mass. at 397, and this inherent authority encompasses the power to suspend with pay a register of probate when the effective administration of justice so demands. See *id.* at 397-398. Section 9 (xxiii) essentially incorporates the inherent judicial authority of the CJTC just described into the panoply of statutory powers that § 9 sets out. Accordingly, there is indeed a statutory basis in § 9 for Chief Justice Carey's suspension of the register on March 5, 2014.[20]

_____

[20]Campatelli argues that the exception stated at the end of G. L. c. 211B,

C. *Chief Justice Ordoñez, G. L. c. 211B, § 10 (vi).* In addition to the authority that the CJTC and Court Administrator have over administration of the Trial Court, the chief justices of the several Trial Court departments are "responsible for the operation of their department, its clerks, other officers and employees." G. L. c. 211B, § 10, first par., as amended by St. 2011, c. 93, § 52. Section 10 enumerates the statutory powers and duties of the departmental chief justices, and therefore Chief Justice Ordoñez. Among those listed is the authority to impose discipline on officers and employees within Chief Justice Ordoñez's department, including suspension with or without pay. G. L. c. 211B, § 10 (vi).[21]

§ 9 (xxiii), preventing the CJTC from exercising any power reserved to this court, applies in this instance because the Legislature expressly reserved to the Justices of the Supreme Judicial Court in G. L. c. 211, § 4, the power to both remove and suspend a register of probate and, therefore, Chief Justice Carey is precluded from suspending Campatelli — in other words, Campatelli claims, use of any "inherently judicial power" that the CJTC may have otherwise had to suspend her is precluded by the plain language of § 9 (xxiii). We have previously considered, and rejected, Campatelli's proffered interpretation of c. 211, § 4, as exclusively vesting the authority to suspend (as opposed to remove) a register of probate. Therefore, we also reject her interpretation of c. 211B, § 9 (xxiii), as carving out of Chief Justice Carey's inherent judicial power the authority to suspend with pay the register of probate or any other official listed in c. 211, § 4, who is part of the Trial Court.

[21]General Laws c. 211B, § 10 (vi), as amended by St. 2011, c. 93, § 52 (§ 10 [vi]), provides the departmental chief justices with the authority

> "notwithstanding any general or special law to the contrary, when necessary to ensure the proper administration of justice, [to] transfer employees of their department to serve where needed; *impose discipline on such officers and employees, including dismissal and suspension with or without pay; provided, however, that they may, upon reasonable notice, temporarily transfer nonjudicial personnel within their department,* divisions and places for holding court, and in no event shall any such transfer be more than a reasonable distance from the place where such personnel is employed unless the employee so transferred shall consent thereto; provided, further, that such transfer of the employee shall not be for more than [ninety] days, but such transfer may be extended for [three] consecutive [ninety-]day periods, provided that notice is given to the house and senate committees on ways and means upon each extension, including the employee's position, duties, and reason for the transfer, but such transfer shall not exceed 360 consecutive days. *The first justice of the court to where the employee is transferred shall provide the first justice of the court to where the employee is permanently assigned* with appropriate personnel records and records of

The language of § 10 (vi) in substance is essentially identical to that of § 9A (xii), concerning the power of the Court Administrator; of particular relevance here is that § 10 (vi) contains the same ambiguous final proviso concerning elected and appointed clerks, clerk-magistrates, registers of probate, and recorders as § 9A (xii). And, as is true of § 9A (xii), the language of § 10 (vi) finds its origins in the 1992 court reform legislation, St. 1992, c. 379, that we considered in connection with the discussion of the Court Administrator, see part 2.a.ii.A, *supra.* See also G. L. c. 211B, § 10 (v), as inserted by St. 1992, c. 379, § 79, which is almost identical to the current § 10 (vi).[22] Significantly, it is almost identical as well to the former § 9 (xxii), as inserted by St. 1992, c. 379, § 77.

The point we draw from these various connections is that the legislative history of St. 1992, c. 379, reviewed at length *supra,* is relevant to the task of understanding the ambiguous final proviso in G. L. c. 211B, § 10 (vi). As was the case with the Court Administrator, that legislative history indicates that the final proviso in § 10 (vi) refers only to provisions in that subsection concerned with transfers of nonjudicial officers and employees of the Trial Court — not with discipline.

Campatelli also argues that our interpretation of § 10 (vi) ignores the additional limitations imposed on Chief Justice Ordoñez's disciplinary authority in G. L. c. 211B, § 10 (i) (§ 10 [i]). In particular, Campatelli asserts that, even if § 10 (vi) authorizes Chief Justice Ordoñez to suspend Campatelli, the Chief Justice may not do so here because of § 10 (i), which, Campatelli argues, limits the Chief Justice's authority to discipline to those disputes that are first raised between a first justice and the register of probate.[23] She claims that because no

---

activities, including records necessary for the payment of compensation; *and provided, however, that this provision shall not apply to a clerk or clerk-magistrate, whether elected or appointed by the governor, register of probate or recorder*" (emphasis added).

[22]The 2011 amendments to G. L. c. 211B created the new position of deputy court administrator (DCA) for each department of the Trial Court. See G. L. c. 211B, § 5A, as inserted by St. 2011, c. 93, § 52. The authority of the DCAs is not at issue in this case.

[23]General Laws c. 211B, § 10 (i), grants the chief justices of the several Trial Court departments, in relevant part:

"the power to appoint, discipline, evaluate, transfer and define the du-

dispute was ever raised between Campatelli and the first justice of the Suffolk County Division of the Probate and Family Court Department, Chief Justice Ordoñez had no authority to suspend Campatelli under § 10 (vi) in December of 2013, or in January or March of 2014. We disagree.

First, notwithstanding § 10 (i), nothing within the plain language of § 10 (vi), or its legislative history, indicates that any formal dispute must be raised before the Chief Justice may exercise her authority to suspend under § 10 (vi). Section 10 (vi) contains no mention of a "dispute," and its own implicit recognition of the Chief Justice's inherent judicial authority to impose discipline "to ensure the proper administration of justice" is inconsistent with such a procedural limitation. Section 10 (i) *does not* alter our conclusion that Chief Justice Ordoñez acted within the bounds of her authority pursuant to § 10 (vi) when suspending Campatelli.[24]

---

ties of all non-judicial personnel within their department including special masters, court reporters, law clerks, temporary clerks and other support personnel consistent with the provisions of [§§] 8 and 10A; provided, however, that they shall not have the power to appoint non-judicial personnel serving in the office of a clerk, recorder or register, but shall have the authority to discipline said clerks, recorders and registers and all other personnel in the offices of said clerks, recorders or registers, upon the raising of any dispute between a first justice and a clerk, recorder or register . . . ."

[24]Finally, our conclusion with respect to the statutory authority of all three court officials to suspend the register of probate with pay also is unaltered by G. L. c. 211B, § 10C, which imposes a general limitation on the three court officials' authority to interfere with the register in the exercise of her powers, duties, and responsibilities absent express statutory authorization. It provides:

"The general superintendence and administrative authority of the chief justice of the trial court, court administrator, and the chief justices of the respective departments of the trial court and the first justices of particular courts shall not include the authority or power to exercise, supersede, limit, prevent the exercise of or otherwise affect any of the powers, duties and responsibilities of the clerks or registers of probate in any general or special law, including laws authorizing or governing the selection and appointment of personnel, *except where expressly authorized*" (emphasis added).

Campatelli argues that by suspending her, the three court officials have impermissibly prevented her from exercising the "powers, duties, and responsibilities" of her office, in plain violation of § 10C. We disagree. Assuming that the three court officials have prevented Campatelli from perform-

b. *Inherent judicial authority.* As the foregoing discussion reflects, all three court officials possessed statutory authority to suspend Campatelli or place her on paid administrative leave. Chief Justices Carey and Ordoñez assert that the suspension of Campatelli with pay pending the investigation of her conduct constitutes a proper exercise of their inherent judicial authority that exists apart from any grant of statutory authority.[25] Campatelli disagrees, asserting that because the office of register of probate is "created and defined by statute," her position is subject to the exclusive control of the Legislature such that she cannot be disciplined by any exercise of inherent judicial authority. Other than her attempt to ground this argument in her erroneous interpretation of G. L. c. 211, § 4, discussed previously, she cites no authority, and provides no explanation of why this is so. It is not.

Among the fundamental principles embedded in the Massachusetts Declaration of Rights is the right to prompt and impartial administration of justice. See arts. 11 and 29. See also *First Justice*, 438 Mass. at 396-397. "It is from these lofty principles that flows the concept of inherent judicial powers, 'whose exercise is essential to the function of the judicial department, to the maintenance of its authority, [and] to its capacity to decide cases.' " *Id.* at 397, quoting *Gray* v. *Commissioner of Revenue*, 422 Mass. 666, 672 (1996). "Although inherent [judicial] powers may be recognized by statute, they exist independently, because they 'directly affect . . . the capacity of the judicial department to function' and cannot be nullified by

ing her duties and responsibilities as register of probate, Court Administrator Spence and Chief Justice Ordoñez were "expressly authorized" to do so by the disciplinary authority granted to them in §§ 9A (xii) and 10 (vi), respectively. As to Chief Justice Carey, whose disciplinary authority over Campatelli exists as part of her inherent judicial authority recognized by G. L. c. 211B, § 9 (xxiii), we previously have indicated that any limitation of authority imposed by § 10C on a chief justice does not preclude her from exercising inherent judicial powers that she otherwise possesses. See *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't*, 438 Mass. 387, 406 & n.12 (2003). Chief Justice Carey possessed inherent judicial authority to suspend Campatelli in appropriate circumstances, and § 10C presented no impediment to her exercise of that authority.

[25]Court Administrator Spence makes no argument that he possesses inherent judicial authority.

the Legislature without violating [the separation of powers principles of] art. 30." *First Justice, supra,* quoting *Opinion of the Justices,* 279 Mass. 607, 613 (1932).

The scope of inherent judicial authority must be broad enough to allow judges to perform core functions necessary for the proper administration of justice. As the Legislature explicitly and implicitly has recognized in both §§ 9 (xxiii) (CJTC) and 10 (vi) (departmental chief justice), respectively, that authority necessarily extends beyond traditional adjudication to include "certain ancillary functions such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate," *First Justice,* 438 Mass. at 397, quoting *O'Coins, Inc.* v. *Treasurer of the County of Worcester,* 362 Mass. 507, 510 (1972), including the authority "to control and supervise personnel within the judicial system," *First Justice, supra,* and the "power 'to control . . . the actions of officers of the court and the environment of the court.' " *Id.* at 397-398, quoting *Chief Admin. Justice of the Trial Court* v. *Labor Relations Comm'n,* 404 Mass. 53, 57 (1989). We previously have held that for clerks and assistant clerks, whose duties are "inextricably related to the work of the courts" and "essential to [their] effective functioning," it is "imperative that a judge possess inherent authority to ensure that [they] perform their jobs faithfully and in a professional manner" and "are qualified and possess the skills and competence to enable them to perform their duties . . . in conformity with governing statutes, rules, orders, and standards of accountability." *First Justice, supra* at 398-399, 401. See *Powers,* 465 Mass. at 82. Similarly, because a register's duties are also "in the main concerned with administering justice," *Retirement Bd. of Somerville* v. *Buonomo,* 467 Mass. 662, 670 (2014), quoting *Opinion of the Justices,* 300 Mass. 596, 598 (1938), and are integral to the successful operation and functioning of our courts, see *First Justice, supra* at 398-399, those principles apply with equal force here.[26] Cf.

---

[26]Our cases discussing inherent judicial authority as it relates to clerks and clerk-magistrates are applicable equally to the register of probate. See S.J.C. Rule 3:12, Canon 1, as appearing in 407 Mass. 1301 (1990) ("The word 'Clerk Magistrate' in this Code [of Professional Responsibility for Clerks of the Court], unless otherwise expressly provided, shall mean anyone serving in the position of Clerk Magistrate, Clerk, *Register* . . ." [emphasis added]).

*Matter of Antonelli*, 429 Mass. 644, 649 (1999) (removal of register of probate is "closely connected with judicial business and does not involve the exercise of a nonjudicial function"). The decision to suspend Campatelli with pay falls well within the inherent judicial authority of Chief Justices Carey and Ordoñez "to control and supervise personnel within the judicial system." *First Justice*, 438 Mass. at 397.

3. *Preliminary injunction.* When she filed her complaint in the county court, Campatelli filed with it a motion for a preliminary injunction, seeking an order that would immediately permit her to resume performing her duties as register of probate. The single justice reported the case to the full court without decision, including the request for preliminary injunctive relief. Campatelli has not addressed that request in her brief, and we therefore treat it as waived. In any event, as the previous sections of this opinion indicate, Campatelli's legal claim here has not prevailed, and the absence of a likelihood of success on the merits of her case defeats the request for preliminary injunctive relief. See, e.g., *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 598 (1992).

*Conclusion.* The case is remanded to the single justice for the entry of a suitable judgment in accordance with this opinion.

*So ordered.*